HOWARD COUNTY ET AL., APPELLEES, v. GEORGE C. PESHA, DEFENDANT: AMERICAN BONDING COMPANY, APPELLANT.

JAMES SCHEE ET AL., APPELLANTS, V. HOWARD COUNTY ET AL., APPELLEES.

FILED MARCH 27, 1919. No. 19986.

1. **Contracts: BUILDING CONTRACT: ESTIMATES BY ARCHITECT.** Under a building contract designating the architect as the sole arbitrator concerning estimates for labor and materials furnished during the progress of the work, and making his decision final, the power thus granted cannot be used arbitrarily to defeat other provisions requiring him to make proper estimates justly due.

2. ———: ———: ———. Unchallenged estimates for labor and materials furnished during the progress of building operations are conclusive in the absence of fraud or mistake, when regularly made by an architect under a building contract designating him as sole arbitrator in such matters and making his decision final.

3. ———: ———: REFUSAL TO MAKE ESTIMATES: FRAUD: EVIDENCE. In an action by a building contractor to recover the amount justly due for labor and materials for which the architect ar-

bitrarily refused to make estimates, proof tending to show that the architect had said he did not deny but what an estimate was due, but that he would not make it, and proof tending to show that he arbitrarily refused to do so, may be admitted on the issue of fraud.

4. Counties: BUILDING CONTRACT: DUTY OF ARCHITECT.   An architect employed by a county board to superintend the construction of a courthouse under a contract with a building contractor who is entitled to estimates as the work progresses is a fiduciary of the county, and if the architect knows any reason why an estimate demanded should not be made, he should state the facts to the county board without being asked.

5. Contracts: FORFEITURE: ACTION FOR MONEY DUE: DEFENSE.   Where a county wrongfully forfeited a contract for the construction of a courthouse partially constructed by a contractor not in default, the county cannot justify its failure to pay the amount justly due under the contract as the work progressed by proving that what had been paid to the contractor and what it cost to finish the job exceeded the contract price.

6. ———: BUILDING CONTRACT: REFUSAL TO MAKE ESTIMATES.   A building contractor is not bound by the arbitrary and unreasonable refusal of an architect to make an estimate justly due under the terms of the building contract, though in such matters he is designated as the sole arbiter with the power of final decision; such conduct being in law a fraud upon the building contractor.

7. ———: ———: ESTIMATES BY ARCHITECT.   Under a building contract designating the architect as sole arbiter with the power of final decision in matters relating to estimates for labor and materials furnished, he must exercise his power with reasonable discretion, and not arbitrarily or unreasonably.

8. ———: RIGHT TO RESCIND.   Generally the right to rescind or forfeit a contract exists only in favor of a party who is not himself in default.

9. ———: BUILDING CONTRACT: RESCISSION.   Under a building contract requiring payments to the contractor as the work progresses, the failure of the owner, upon demand, to make a payment known by both parties to be due may justify the contractor, if not himself in default, in refusing to proceed further with the work of construction.

10. Counties: BUILDING CONTRACT: PAYMENT: PLEA OF ULTRA VIRES.   Where a county enters into a valid contract for the construction of a courthouse, it cannot, by pleading want of power, escape the payment of just claims for labor and materials accepted and used under the terms of the building contract.

11. ———: Loan to Contractor: Liability of Surety. A loan of
money to a building contractor to pay for labor and materials is
not secured by a bond given by him and his surety for the pro-
tection of persons furnishing labor and materials.

12. Contracts: Cancelation: Recovery. Where the owner of a par-
tially constructed building wrongfully cancels a building con-
tract requiring him to pay 85 per cent. of the estimates for labor
and materials as the work progresses and permitting him to re-
tain 15 per cent. of such estimates, the contractor may recover
both percentages.

13. Assignment by Contractor: Enforcement. An accepted assignment
of the "first $10,000" awarded to the contractor under a
building contract requiring payments on estimates as the work
progresses, held enforceable as to an estimate for a less sum
than that mentioned.

14. Appeal: Dismissal of Cross-Petition. A judgment dismissing the
cross-petition of a defendant who did not appeal therefrom will
not be disturbed on an appeal by another defendant from a judg-
ment conforming to the prayer of plaintiff's petition.

Appeal from the district court for Howard county:
James R. Hanna, Judge. *Reversed in part, and affirmed
in part.*

*Fawcett & Mockett, C. G. Ryan, Claude S. Wilson*
and *S. S. Bishop,* for appellants.

*T. J. Doyle* and *Charles Dobry, contra.*

Rose, J.

Four suits growing out of controversies relating to
the construction of a courthouse at St. Paul, Nebraska,
were consolidated below for trial. The appeals herein
involve two of those cases, which, for the purposes of
review, will be stated separately.

In one of the cases in which an appeal is taken,
Howard county sued George C. Pesha, the original
contractor, and his surety, the American Bonding Com-
pany, to recover damages in the sum of $25,000 for
alleged breach of the building contract. Pesha agreed
to construct a courthouse in keeping with plans and
specifications prepared by Berlinghof & Davis, archi-
tects, and adopted by the county board. The price of

construction recited in the contract was $69,510, pay-
ments to be made from time to time to the extent of
85 per cent. of estimates of the architects during
the progress of the building operations. Pesha obli-
gated himself to commence work immediately and to
complete the courthouse by January 1, 1914. To
secure performance of the contract on the part of
Pesha, the American Bonding Company became his
surety November 14, 1912, in the penal sum of $25,000,
on the following terms:

"If the said George C. Pesha shall well and truly
keep and perform all the conditions of this contract
and pay off and settle in full with the person or per-
sons entitled thereto all accounts and claims that may
become due by reason of laborers' or mechanics'
wages, or for material furnished, or services rendered
said George C. Pesha in executing or performing the
obligations of said contract, so that each of such per-
sons shall receive his just dues in that behalf, then
this obligation shall be of no effect; otherwise it shall
remain in full force and effect in law."

The county, in its petition, pleaded in detail that on
and prior to June 18, 1913, Pesha failed to pay his
laborers, who, for that reason, refused to work; that
he thereafter neglected his duties and refused to per-
form his contract; that Pesha and his surety were
notified of the former's default, were warned of a
forfeiture in the event of further delay, and were
directed November 20, 1913, to complete the courthouse;
that nevertheless Pesha and his surety refused to pro-
ceed further with the work, and abandoned the contract
when there was nothing due the contractor; that by
reason of the default the county, acting under the
contract, took the unfinished job out of the hands of
Pesha and his surety, and directed the architects to
complete the building for the county; that the county
paid Pesha $32,527.69, and expended in addition for
completing the courthouse $57,206.64, making a total
cost of $89,734.33, or $20,224.33 in excess of Pesha's

contract price. Including stipulated damages of $25 a day for Pesha's delay, the county prayed for judgment against him and his surety in the sum of $25,000.

Pesha filed an answer and a cross-bill, denying that he had violated his contract in any respect, and pleading, in substance, among other things, that the delays of which the county complained were caused by the county board and the architects; that the architects illegally and fraudulently refused to make estimates or certificates of progress to which Pesha was entitled under the contract, and thus prevented him from receiving compensation justly due; that the county board knowingly refused to make payments due him; that he did not delay the work or abandon the contract, but that he was wrongfully prevented by the architects and the county board from completing the building; that the forfeiture of the contract was illegal and was declared without his consent; that the county board, over his protest, unlawfully and forcibly took possession of the partially constructed building, and wrongfully seized and used his materials and machinery. He prayed for the dismissal of the county's suit and for a judgment in his favor for damages in the sum of $30,445.56.

The substance of the principal defense pleaded by Pesha's surety, the American Bonding Company, is that Pesha did not violate the building contract in any respect justifying the forfeiture; that the architects arbitrarily and fraudulently refused to make estimates and to issue certificates of progress showing the sums justly due under the contract; that the county board with full knowledge of the facts acquiesced in the fraud of the architects, wrongfully refused to make payments known to be due, and thus violated the contract and released the contractor and his surety from further liability thereunder.

The trial court rendered a judgment in favor of Howard county and against Pesha and his surety for $20,156.49, and dismissed the cross-petition of Pesha.

From this judgment the surety, the American Bonding Company, alone has appealed.

In the other case in which an appeal is taken Schee & Callahan are plaintiffs, and Howard county, George C. Pesha, and his surety, the American Bonding Company, are defendants. The claims of Schee & Callahan arose in the following manner: June 24, 1913, Pesha, to procure money to continue his work on the partially constructed courthouse, assigned to Schee & Callahan his right to receive from Howard county future payments to the extent of $10,000, the county accepting the assignment. The building contract, the suretyship of the American Bonding Company, the assignment, the acceptance, the furnishing of $10,000 to Pesha, the use of $8,782.36 for labor and material in the work on the courthouse, and the failure of the county to pay any part of the claims of Schee & Callahan are pleaded in detail. Two causes of action are stated. The first is an unpaid claim of $5,509.30, with interest from November 13, 1913, established by an estimate of the architects, and the second is an unpaid claim of $3,273.06, with interest from November 13, 1913, and is like the first, except that the amount due was not determined by an estimate of the architects, who, as it is alleged, failed to perform their duty in that particular.

Howard county pleaded, in substance, as a defense that Pesha violated his building contract; that he abandoned the job when partially completed; that the contract was properly forfeited by the county after default of Pesha and notice to him and his surety; that the county completed the unfinished courthouse; that there was nothing due Pesha when he defaulted or afterwards; that Schee & Callahan acquired by the assignment no greater rights than those of Pesha, and that there was nothing due either from the county.

The trial court dismissed the suit as to Howard county and as to the American Bonding Company, and entered a judgment in favor of Schee & Callahan and

against Pesha for $11,902. From this judgment Schee & Callahan have appealed.

Questions common to both appeals may be stated as follows: Who first broke the contract? Did Pesha abandon it? Did the architects fraudulently refuse to make or to properly certify estimates for labor and materials as the work progressed? Did the county wrongfully refuse to make payments justly due under the terms of the contract? On the part of the county was there a breach of contract to justify the contractor in refusing to proceed further under it? These questions are raised by the pleadings in both cases. An examination of the evidence is necessary to a decision.

The building contract was executed October 26, 1912, and among other provisions therein are the following:

"Estimates will be made and progress certificates will be issued by the architect from time to time as the work progresses, for materials furnished, on the ground or incorporated into the building, and for labor performed thereon in accordance with the meaning of all the plans, and both the technical and general specifications; and the amount to be paid to the contractor shall be eighty-five per cent. (85%) of the amount of such estimate on the presentation of the progress certificate."

Pesha commenced his building operations under the contract and proceeded therewith until June 6, 1913, when he had used in the work of partial construction $38,267.35, and had received 85 per cent. thereof, or $32,527.69, on estimates and progress certificates. By June 24, 1913, he was financially embarrassed, and the laborers quit work temporarily because wages due them had not been paid. The architects declined to make any further estimate, and Pesha, to procure funds to comply with his contract, according to its terms, executed the following assignment:

"For a valuable consideration to me in hand paid, receipt of which is hereby acknowledged, I, the under-

signed, hereby sell, assign and transfer to James Schee and D. R. Callahan of College View, Neb., the first ten thousand dollars ($10,000) that is awarded and made payable to me by reason of the contract and construction and erection of the county courthouse in St. Paul, Howard county, Nebraska.

"And I, the undersigned, do hereby authorize and direct the board of county commissioners of Howard county, Neb., to pay the said James Schee and D. R. Callahan all sums of money that may now be due to me or that may become due and payable to me from time to time for the construction of said courthouse until the sums so paid shall aggregate the sum of $10,000 with 8% annual interest thereon from date hereof, and this instrument shall be your receipt for all moneys so paid by you as a board of county commissioners to the said James Schee and D. R. Callahan.

"This instrument is given to said James Schee and D. R. Callahan for the purpose of securing the payment of one certain promissory note of mine, to them, of even date herewith and for the sum of $10,000 bearing 8% annual interest from date hereof. The money represented by said note is this day advanced to me for the purpose of and will be used for the payment of labor and material that have been and will be used in the construction of said county courthouse at St. Paul, Neb., for Howard county.

"This instrument is to take effect from this date and to be and remain in full force and effect until its terms are fully complied with and shall stand as security for the payment of the note above referred to until the same is fully paid with all accrued interest and that it shall secure any renewals of said note as fully as the one of even date herewith."

This assignment was executed June 24, 1913, and was promptly filed in the office of the county clerk. The official acceptance thereof by the county board is in the following form:

"George C. Pesha appeared before the county board
and presented to the county board the within assign-
ment of future estimates in the sum of $10,000 upon the
courthouse construction fund to J. Schee and D. R.
Callahan of College View, Neb., for the purpose of ob-
taining from said parties an advancement to him of said
sum to be used in paying for labor and material in
the further construction of the courthouse and to
facilitate said work. The board after due consideration
hereby expresses its willingness to pay to the said
James Schee and D. R. Callahan the said sum of money
on estimates so assigned hereafter to be made by the
architect from time to time with the understanding and
upon the conditions that said money shall be used to
pay for labor now performed and due and hereafter
to be performed, and for material hereafter to be fur-
nished, and put into said building, receipts to be filed
with the board for such labor and material before any
estimate is made and money paid out."

Under the assignment and the acceptance, Schee &
Callahan were to furnish Pesha with funds to complete
the courthouse. This was to be done in the following
manner: On vouchers showing the performance of
labor and the furnishing of materials, Schee & Calla-
han were to furnish Pesha with money from time to
time to pay the claims therefor to the extent of
$10,000. Funds paid to Schee & Callahan by the
county on estimates of the architects were to be re-
turned to Pesha to be again used by him in the manner
indicated. Evidence that Schee & Callahan were financi-
ally able to carry out this plan and had agreed in good
faith to do so is uncontradicted. The members of the
county board were familiar with the understanding
between Pesha and Schee & Callahan, and the architects
had been advised in regard to it. After Schee & Calla-
han had furnished Pesha with several thousand dollars
which actually went into the courthouse in the form of
labor and materials, the architects refused to make any
estimate whatever for the benefit of either Pesha or

Schee & Callahan. Under the circumstances was the conduct of the architects fraudulent in law? Some of their powers and duties were defined by the building contract as follows:

"The architect shall be sole arbitrator concerning disagreements, delays, suspension, abandonment, estimates, general interpretation of both the general and technical specifications."

"The estimate, certificate or final acceptance of work by the architect, and his decision in any way concerning the same shall be final and conclusive; and such estimate, or decision, or both, in case any question shall arise shall be a condition precedent to the right of the contractor to receive any money or compensation for anything done or furnished under this agreement."

The county relies on these provisions, but the powers granted by them cannot be used arbitrarily by architects to defeat the provisions requiring them to make proper estimates as the work progresses. The evidence must be considered in the light of the contract as a whole. Before the claims of Schee & Callahan arose, the architects had made in favor of Pesha, and the county had paid to him, estimates numbered consecutively from 1 to 6 as follows:

|                   | Estimate.  | Less 15%.  | Payment.    |
|-------------------|-----------|-----------|-------------|
| January 29, 1913, | $6,000.00 | $ 900.00  | $5,100.00   |
| February 25, 1913,| 5,882.35  | 882.35    | 5,000.00    |
| April 7, 1913,    | 8,000.00  | 1,200.00  | 6,800.00    |
| May 10, 1913,     | 9,000.00  | 1,350.00  | 7,650.00    |
| June 5, 1913,     | 8,000.00  | 1,200.00  | 6,800.00    |
| June 6, 1913,     | 1,385.00  | 207.82    | 1,177.18    |
|                   | $38,267.35| $5,740.17 | $32,527.18  |

The foregoing estimates were regularly made by the architects, who issued progress certificates thereon, and the county paid 85 per cent. thereof as shown by the tabulation. These estimates are not challenged, and are therefore, under the terms of the building con-

Neb. 103.—20.

tract, conclusive for the purpose of making payments during the progress of the work. 9 C. J. 703, sec. 23. It is thus established that by June 6, 1913, Pesha, under the contract to construct the courthouse for $69,510, had put into the work in the form of labor and materials $38,267.35, and had received therefor $32,527.18, only. What had thus far been done by Pesha was accepted by the county and is now a part of the completed structure. The building contract was then in force. The work of Pesha proceeded without substantial interruption from June 25, 1913, until October 13, 1913. In the meantime Schee & Callahan, concededly, had put into the building under the assignment and the county's acceptance, without any estimate or payment in return, more than $5,000. No estimate therefor having been made, the county board, October 13, 1913, directed the county attorney to examine the receipts filed in the office of the county clerk by Pesha under the Schee & Callahan assignment, to see that such receipts were for materials bought and put into the building after June 25, 1913, and for unpaid labor before and after that date. The county attorney made a detailed report November 4, 1913, showing the expenditures in labor and materials for the period mentioned to have been $5,509.30. The next day the county board made the following order:

"The report of Charles Dobry was taken up for consideration. The board investigated said report. Finds that the items reported as correct are for labor performed on courthouse and for material furnished and used in the courthouse since June 25, 1913, and the architect is requested to make an estimate on $5,509.30, the amount so found expended according to the resolution of date June 25, 1913."

The architects, in a communication embodying the foregoing order of the county board, executed the following document November 5, 1913:

"We hereby make an estimate of five thousand, five hundred nine and 30/100 dollars ($5,509.30), less 15% which equals four thousand six hundred eighty-two and 90/100 dollars ($4,682.90) in favor of the contractor George C. Pesha. We make this pursuant to your order and disclaim personal responsibility.

"Berlinghof & Davis, Architects and Supts."

By the use of the expression, "We make this pursuant to your order and disclaim personal responsibility," the architects defeated the purpose of the estimate to which both Pesha and Schee & Callahan were entitled. After repeated requests for the elimination of such statement, the architects refused to take it out of the estimate, and with it in, the county board refused to make any payment to either Pesha or Schee & Callahan. No other estimate or payment was ever made under the assignment, though Schee & Callahan put into the courthouse through Pesha, according to the literal terms of the county's acceptance, $8,154.76. While these funds were going into the courthouse without any compensation to those who provided them, there was no attempt to stop work on account of delays or to cancel the building contract for any reason. It was after the architects and the county board had prevented further estimates and payments for labor and materials and had thus destroyed Pesha's means of procuring funds to carry on his work that the forfeiture of the building contract was declared by the county. In addition, there is evidence that the architect Berlinghof had said he would not deny but what there was an estimate due, but that he would not issue the certificate; that he refused to give the reasons why; that he would not make another estimate unless coerced by the court into doing so; that in reply to the assertion, "There was $12,000 or $15,000 due Pesha," he had said, "There was no more than $12,000 due him;" that he would not issue a certificate; that he had stated the courthouse could be finished for $42,000. Though there were efforts to contradict

some of the proofs of this nature, the preponderance of the evidence is against the architects. Such proof is admissible on the issue of fraud. On this subject the supreme court of New Jersey said:

"It is evident that the question of fact in each case where a certificate has been withheld is whether such withholding by the architect was a fraud upon the builder. How fraud in this respect may be proved must depend upon the circumstances of individual cases. One of the ways in which it is conceived that the fraudulent conduct of the arbiter might be made to appear is by proving that he stated that the builder was in his opinion entitled to his certificate, followed by proof of an arbitrary refusal to furnish the certificate itself." *Bradner v. Roffsell,* 57 N. J. Law, 32.

The circumstances under which the architects refused to make a proper certificate November 5, 1913, have already been narrated. Pesha, financially embarrassed, had put into the building contract at least $38,267.35 and had received from the county $32,527.18 only. He had made an assignment under which Schee & Callahan had agreed to finance him to the end. Under that assignment $5,509.30, concededly, had also gone into the building in the form of labor and materials without any compensation to the contractor or to those who had furnished the money. The county had received the benefits. The county attorney and the county board had examined and approved the vouchers. The county board, Pesha and Schee & Callahan had demanded an estimate. It was justly due. When the architects, under such circumstances, wrote on their estimate, "We make this pursuant to your order and disclaim personal responsibility," without giving any reason therefor, they furnished in writing *prima facie* evidence of their fraud. *Chism v. Schipper,* 51 N. J. Law, 1. In law and equity their duty to make a proper estimate justly due was as imperative as their fidelity to their principal. They were the fiduciaries of the

county. If there was any reason why an estimate should have been withheld, their agency required them to disclose it without being asked. The evidence adduced at the trial after the courthouse was completed does not show a good reason for the withholding of the estimate. Berlinghof was asked on the witness stand, "Why didn't you give Pesha another estimate?" The answer was: "Under various conditions at that time: First, we had gone the limit; and, second, on account of his financial condition, the amount of money in sight to be expended, the work to be performed, it was useless to proceed any more. Couldn't be done." Facts which justify the withholding of the estimate are not stated in the answer quoted and are not to be found elsewhere in the record. It has already been shown that Schee & Callahan were able to finance Pesha and had agreed in good faith to do so. Proof that the courthouse, when completed by the county, cost about $20,000 more than the contract price does not justify the failure to make the estimate required by the contract. That is not the stipulated method of ascertaining the amounts due from time to time during the progress of the work, while the contract is in force. If the contract price was too low, the county was protected by a bond in the penal sum of $25,000 and by the right to retain 15 per cent. of estimates for labor and materials as furnished. There was no justification whatever for the failure of the architects to make and certify unconditionally in due form the estimate justly due, and their conduct in that respect was unreasonable and arbitrary and amounted in law to a fraud upon Pesha and upon Schee & Callahan. The law applicable to the facts in these cases has been stated in various forms by courts, text-writers and annotators as follows:

"The contractor will not be bound by the decision of an architect, * * * in case of fraud or mistake so great as to imply bad faith on his part." *Edwards v.*

*Hartshorn,* 1 L. R. A. n. s. 1050, and note (72 Kan. 19).

"The arbitrary or unreasonable refusal to issue a certificate of performance will, however, constitute such fraud as to render the production of such certificate unnecessary, though made a prerequisite to recovery by the contract." *Edwards v. Hartshorn,* 1 L. R. A. n. s. 1050, and note (72 Kan. 19); *Crane Elevator Co. v. Clark,* 26 C. C. A. 100; *Parlin & Orendorff Co. v. Greenville,* 61 C. C. A. 591; *Bradner v. Roffsell,* 57 N. J. Law, 32; *Pittsburg Terra-Cotta Lumber Co. v. Sharp,* 190 Pa. St. 256; *Bently v. Davidson,* 74 Wis. 420.

"Case will lie at the suit of a builder against an architect who wrongfully withholds a certificate required under the contract to be given by him upon satisfactory performance." 5 C. J. 278, sec. 45.

"Where payment of the builder is dependent upon a certificate, decision, or estimate of the architect or engineer, it is the duty of the latter to give the certificate, upon being satisfied that the builder is entitled thereto, and must exercise his power of withholding a certificate with reasonable discretion and not capriciously, and is only justified in refusing where there is a real and substantial failure on the part of the builder to fulfil his duty under the contract." 6 Cyc. 35, and notes.

"The whole grievance of appellant, as set out in his assignments of error, is based on failure of plaintiff to produce the written certificate of the architect that the work was completed to his satisfaction and within the time stipulated in the contract. We fear appellant misapprehends the purpose of this provision; evidently, it was inserted to protect the owner against any unjust or unfounded claim by the contractor, and in that view of it, it was a reasonable provision; but if the contractor honestly performed its covenants, it was not intended to protect the owner from an honest payment of the price by a capricious or fraudulent with-

holding of the certificate.'' *Pittsburg Terra-Cotta Lumber Co. v. Sharp,* 190 Pa. St. 256.

''The architect does not seem to have exercised an independent judgment touching the performance of the contract. He appears to have contented himself with forwarding the objections of the owner of the building, without judgment by him of the correctness of those objections. Indeed, he entertained an erroneous idea of his duty. He was not an arbiter between the owner of the building and the plaintiff. He was a judge between the plaintiff and the defendant, and it was his duty to investigate and to decide, with respect to the contract in question, whether its terms had been performed, and, failing in performance, to point out wherein there was failure to perform, or defective performance, that the plaintiff might have opportunity to complete performance according to the terms of the contract.'' *Crane Elevator Co. v. Clark,* 26 C. C. A. 100.

''An agreement in a building contract that there shall be no liability to pay for work except upon the architect's certificates is valid; but if such certificates are arbitrarily and dishonestly withheld the builder may recover on showing that fact and that he has performed the contract according to its terms.'' *Bently v. Davidson,* 74 Wis. 420.

The law, therefore, is that the arbitrary and unreasonable refusal of the architects to make estimates did not defeat the right of Schee & Callahan to recover from the county the amount due them under their assignment. The county board, acting for the county, investigated the facts and knew that an estimate should have been made. In failing to pay what was honestly due they acquiesced in the .wrongful conduct of the architects, and in behalf of the county violated the building contract and released both the contractor and the surety from further liability thereunder. The county thus lost the right to cancel the contract on account of the subsequent failure of Pesha to proceed under it.

On this phase of the controversy the controlling principles have been stated as follows:

"The rule is general that the right to rescind a contract rests only with the party who is without default. One party cannot violate the contract himself, and then seek a rescission on the ground that the other party has followed his example." *Fairchild-Gilmore-Wilton Co. v. Southern Refining Co.*, 158 Cal. 264.

The consequence of violating a building contract by a refusal to pay the contractor the amount due under it as the work progresses has often been discussed by courts and law-writers. The following excerpts indicate the course of the law:

A failure of the owner to pay an instalment due under the terms of the contract may justify the builder in abandoning the contract, where the builder himself was not in default. 9 C. J. 725, sec. 61, note 69; *South Fork Canal Co. v. Gordon*, 6 Wall. (U. S.) 561; *Fairchild-Gilmore-Wilton Co. v. Southern Refining Co.*, 158 Cal. 264; *Clark v. Gulesian*, 197 Mass. 492; *Bean v. Miller*, 69 Mo. 384; *Condon v. Church of St. Augustine*, 98 N. Y. Supp. 253; *Worden v. Connell*, 196 Pa. St. 281; *Dobbins v. Higgins*, 78 Ill. 440; *Harton v. Hildebrand*, 230 Pa. St. 335.

"In a contract to make and complete a structure, with agreements for monthly payments, a failure to make a payment at the time specified is a breach which justifies the abandonment of the work, and entitles the contractor to recover a reasonable compensation for the work actually performed." *South Fork Canal Co. v. Gordon*, 6 Wall. (U. S.) 561.

"Where work is done under a contract which provides for payment by instalments at stated periods, and the payments are not made, the contractor may quit the work, and he will then be entitled to recover for all that he has done at the contract rates; and this notwithstanding the contract provides in express terms that the work shall be steadily prosecuted without

intermission to final completion." *Bean v. Miller,* 69 Mo. 384.

"Where it is stipulated in a contract that the work to be done under it is to be paid for upon the estimates of an engineer, to be made at stated times, if the engineer makes only approximate estimates, and the contractor is prevented from completing the work through the fault of the other party, he may recover for the whole amount of work done, as well that of which no estimate has been made as that which has been estimated." *Bean v. Miller,* 69 Mo. 384.

It is no answer to these propositions that the county is without power to pay the claims of Schee & Callahan for labor and materials furnished in the construction of the building. The county agreed to do so and broke the contract in that particular after accepting its benefits. Like others exercising the power to make a contract, it is answerable for a failure to comply with its obligations.

After its breach of contract the county, under the assignment, was not only liable to Schee & Callahan for 85 per cent. of their loans which went into the courthouse in the form of labor and materials, but was liable for the percentage which might have been retained had the contract remained in force.

Schee & Callahan furnished money to Pesha on a note secured by the assignment, and did not furnish labor or materials within the meaning of the contract or the surety bond. *Independent School District v. Mardis,* 106 Ia. 295. The American Bonding Company, therefore, is not liable to Schee & Callahan for the county's indebtedness to them.

The county cannot escape liability on the ground that it was not required to make any payment to Schee & Callahan until they in fact contributed the full sum of $10,000. The county's acceptance and the understanding of all of the parties show conclusively that payments under the assignment were to be made from

time to time on estimates, and this was in harmony with the building contract.

In the suit brought by Howard county to recover damages from Pesha and his surety for breach of the building contract, the joint judgment against them for $20,156.49 is reversed. Pesha did not appeal from the separate judgment dismissing his cross-petition, and the dismissal as to him will not be disturbed.

In the suit of Schee & Callahan against Howard county, Pesha, and the American Bonding Company, the dismissal as to Howard county is reversed, and the district court is instructed to enter a judgment in favor of Schee & Callahan and against Howard county for $8,154.76, with interest from November 13, 1913. The judgment in favor of Schee & Callahan and against Pesha for $11,902 is affirmed. The judgment dismissing the suit as to the American Bonding Company is affirmed. The costs in both suits in both courts will be taxed to Howard county.

JUDGMENT ACCORDINGLY.

LETTON, CORNISH and ALDRICH, JJ., not sitting.