**WARNER CONST. CO. v. LOUIS HANSSEN'S SONS. ***

Circuit Court of Appeals, Eighth Circuit.
May 24, 1927.

No. 7607.

1. Contracts ⬅286(4)—Arbitrator's settlement of amount due under contract held final, unless avoided for his fraud, and bar to action for breach.

When parties to contract therein agree on umpire or arbitrator, and empower him to make settlement of amount due from one to the other in performance of contract, and provide that his determination shall be final and binding

*Rehearing denied September 14, 1927.

on both, neither can sue the other for acts based on the contract relation, without avoiding the settlement for arbitrator's fraud, gross mistake, or failure to exercise honest judgment.

2. Contracts ⬅286—Under contract reserving right of final inspection, partial settlements and acceptances during progress of work are not binding.

Where right of final inspection and approval of work already done under a contract is reserved, the party in whose favor the reservation is made is not bound by partial settlements and acceptances as the work has progressed, and arbitrator at time of final inspection is the one clothed with authority to make the final decision.

3. Contracts ⬅284(4)—Conclusiveness of arbitrator's decision on final inspection may not be implied.

Under contract reserving right of final inspection, conclusiveness of arbitrator's decision on final inspection may not be implied.

4. Contracts ⬅284(1)—To reserve right of final inspection and approval until completion of contract, it is sufficient if intent be clearly and unambiguously expressed.

It is not necessary that any set form of words be used in contract to express intention of parties to reserve right of final inspection and approval of work until final inspection by arbitrator, but it is sufficient if the intent be clearly and unambiguously expressed.

5. Contracts ⬅286—Under building contract, constructing quartermaster held authorized to reject hardware delivered and installed by subcontractor, notwithstanding previous approval of samples by his predecessor and general contractor.

Where contract for the construction of a Veterans' Hospital for United States, providing that no preliminary test or partial acceptances should preclude government from rejecting work on final inspection at completion, and making constructing quartermaster and Quartermaster General final judges respecting defects and compliance with contract, and contract between general contractor and subcontractor relating to furnishing and installing finished hardware contained same reservation, and was made subject to all stipulations and agreements in principal contract, held that, in absence of fraud or failure to exercise honest judgment, constructing quartermaster was authorized to reject, as inferior, hardware delivered on job and installed in place, notwithstanding his predecessor and general contractor had previously approved samples, where schedules required to be furnished with samples were not furnished by subcontractor.

6. Contracts ⬅198(2)—Under building contract providing that finished hardware should be stock of approved manufacturers, that hardware required was not kept on hand held not to show it was not "stock."

Under contract for construction of Veterans' Hospital for United States, providing that description of items contained in specifications should be considered as standard, and that all finished hardware should be stock of approved

manufacturers, *held*, that fact that much of hardware demanded to be furnished by constructing quartermaster was not kept on hand did not show that it was not "stock," within specifications; "stock" article meaning one that is standard on the market, and with any particular firm it is stock of that firm, and does not necessarily have to be at all times in quantities on the shelves.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Stock.]

**7. Contracts �call=164—Subcontractor must be held to have contracted with knowledge of contract requirement that articles specified should be best of their kind.**

Where contract for construction of Veterans' Hospital for United States provided in specifications that articles specified therein should be of the best of their kind, and' subcontract was made subject to terms of general contract, subcontractor must be held to have contracted with knowledge of the right of the constructing quartermaster to insist on this provision.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action by Louis Hanssen's Sons against the Warner Construction Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Chester E. Cleveland, of Chicago, Ill. (Harold F. Thuenen, of Davenport, Iowa, on the brief), for plaintiff in error.

Herbert E. Sitz, of Davenport, Iowa (C. D. Waterman, of Davenport, Iowa, on the brief), for defendant in error.

Before LEWIS and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. December 30, 1922, plaintiff in error contracted with the United States, through the Director of the United States Veterans' Bureau, to furnish all labor, equipment, or material necessary to complete all buildings and utilities comprising the United States Veterans' Hospital at Knoxville, Iowa, in accordance with specifications prepared by the Quartermaster General of the Army, for the sum of $889,974; the work to be completed on or before August 14, 1923. By this contract it was provided that if any changes were made, increasing or decreasing the amount due thereunder, an equitable adjustment would be made. The contract also contained the following provisions:

*"Adjustment of Claims and Disputes.—* That, except as otherwise specifically provided in this contract, any claims, doubts, or disputes upon matters of fact concerning or arising out of this contract, or as to its performance or nonperformance, shall be referred to the Quartermaster General of the Army for determination, and his decision shall be binding and conclusive as to any question, matter, or thing so submitted, but shall not decide any question of legal rights or liability; and no suit, action, or claim shall be sustainable in any court of law or equity against either party hereto until after the reference and decision above provided for. The decision upon any reference shall be carried out by the parties hereto as within the contemplation of this contract."

*"Inspection.—*That the work shall be subject to observation, inspection, and tests by the United States at any and all times during its performance, in order to determine its compliance with the requirements of this contract, and it shall be subject to acceptance or rejection by the United States. For this purpose the United States may maintain an inspector or inspectors at the place where, and during the time, this contract is being performed. Such inspectors may, with the approval of the constructing quartermaster, reject any articles of work, or components thereof, and materials found not to be in compliance with the requirements of this contract. No preliminary test or acceptance shall preclude the United States from rejecting work upon final inspection or test at completion. Nothing contained in this article shall limit or annul any special inspection or test which may be called for by the drawings and specifications forming a part of this contract. No acceptance, inspection, or payment under this contract shall deprive the United States of any claim against the contractor hereunder by reason of fraud or deception, or by reason of latently defective articles, materials, or workmanship."

It is further provided: "That in case of the failure of the contractor to comply with the stipulation of this contract according to the true intent and meaning thereof (including the requirements for progress of performance to the satisfaction of the constructing quartermaster, or higher authority), the United States shall have the right to complete the work in such manner as shall be deemed best for the interest of the public service."

January 26, 1923, defendant in error contracted with plaintiff in error to furnish and deliver to the above named hospital all the necessary finished hardware, as called for under the plans and specifications made by the United States government architect, to the satisfaction, and under the direction, of the constructing quartermaster, and completely

and faithfully to execute the work and furnish all the materials therefor in such manner as fully to carry out the contract and design according to its true spirit, meaning, and intent to the full and complete satisfaction of the United States government constructing quartermaster and superintendent. The consideration to be paid was fixed at $9,000. This subcontract contained the following provision:

"It is also further agreed that the said party of the second part may make all alterations, by adding, omitting, or deviating from the aforesaid plans, drawings, and specifications, or either of them, which they shall deem proper, and the said C. Q. M. shall advise, without impairing the validity of this contract, and in all such cases the C. Q. M. shall value or appraise such alteration, and add to or deduct from the amount herein agreed to be paid to said first party the excess or deficiency occasioned by such alteration. It is further agreed that, in case of any difference of the plans, drawings, and specifications hereto altered, the decision of U. S. government construction Q. M. shall be final and binding on all parties hereto."

The sections of the specifications relating to finishing hardware pertinent to the contentions urged are the following:

"General.—The description of items herein contained shall be considered as standard, and, unless specifically otherwise mentioned, all hardware used throughout the work shall be equal thereto in size, weight, material, and workmanship. All finishing hardware shall be stock from the Sargeant & Co., Yale & Towne, Corbin, Stanley, Russell & Erwin, or equally approved manufacture.

"Hardware Samples.—Samples of all the different items of 'rough' and 'finishing' hardware required for proposed work shall be submitted to the C. Q. M. for his approval before any hardware is delivered and applied. After checking hardware delivered against the samples so approved, said samples shall be installed on the work and a record kept of their location. Whenever the weight of any article is specified, it shall mean weight exclusive of screws, washers, etc.

"Hardware Schedule.—A complete schedule of all the finishing hardware required for completing the buildings, and following the requirements of these specifications, must be submitted by the contractor, who shall promptly make all necessary corrections in his schedule which may be required by the C. Q. M., and shall file a corrected copy of the schedule as finally approved. Approval of the schedule will not relieve the contractor of responsibility for errors or omissions which it may contain.

"Material and Finish.—Exterior hardware, except otherwise specified, shall be of standard cast bronze, with all exposed surfaces of highly polished finish."

Under the heading "General Conditions," the following specifications are found:

"Interpretation of Contract.—Unless otherwise specifically set forth, the contractor shall furnish all materials, labor, etc., necessary to fully complete the work according to the true intent and meaning of the drawings and specifications, of which intent and meaning the C. Q. M. shall be the interpreter. Except when otherwise indicated, no local terms or classifications will be considered in the interpretation of the contract or the specifications forming a part thereof."

"Quality of Materials.—Except it be otherwise specified, all materials are to be of the best quality of their respective kinds. Where two or more varieties of materials are specified for any purpose, it shall be optional with the contractor which is used, but in any one building the same material must be used throughout for that particular purpose. In all cases where an article is mentioned in the specifications in connection with the words 'best quality,' 'approved quality,' or 'equal to,' the C. Q. M. shall decide what shall be used. The contractor shall furnish the names of the manufacturers of the machinery, pumps, motors, and mechanical appliances of every description, together with rated capacities and other necessary information to the C. Q. M. for his written approval before ordering or purchasing any of the above equipment. Where any particular brand of manufactured article is specified, it is to be regarded as a standard. Another brand or make equally as good in the opinion of the C. Q. M. will be accepted.

"When required by the C. Q. M., the contractor will furnish him in advance with samples of the material he proposes to use on the buildings, and samples so furnished must, after having been approved, be adhered to. The contractor will be held responsible for all delays caused by rejection by the C. Q. M. of materials of any kind which are found unfit for use or do not conform to samples furnished. In contracts for public works in the United States preference shall be given to American material, and all labor thereon shall be performed within the jurisdiction of the United States."

The constructing quartermaster in charge from the beginning of the work until May 9, 1923, was one Capt. Stirling. In February

and March, 1923, defendant in error furnished samples of hardware to plaintiff in error; the latter transmitted the same to Constructing Quartermaster Stirling. These samples were approved. The letter of Constructing Quartermaster Stirling to defendant of February 14, 1923, contains this language:

"Finished hardware like samples submitted will be used where specified. In connection with the master key system outlined in hardware contractor's letter, same is satisfactory.

"Attention is invited to paragraph 367 of the specifications. This paragraph should be carefully observed. Your attention is also invited to paragraph 368. This paragraph should be complied with as soon as possible."

Paragraph 368, referred to and quoted above, refers to the complete schedule of all finishing hardware required for completing the buildings. Constructing Quartermaster Stirling testifies that during his service on this work he received no schedule of hardware from defendant in error. He says:

"That schedule would have shown the kind, quantity, etc., of the material to be furnished. By 'kind' I refer most particularly to the make and catalogue number, so that the list would be checked over as required by this paragraph.

"The intention in this case was to have this schedule submitted to my office for scrutiny, and I intended to submit it to the Quartermaster General for his approval. * * *

"When the constructing quartermaster receives a schedule of this kind, he checks it first. He approves or disapproves it before he sends it to the Quartermaster General; then the Quartermaster General's office would check it, and approve or disapprove any or all of the items, which would then permit the discussion and adjustment of any differences."

On May 11, 1923, Capt. Godwin succeeded Capt. Stirling as constructing quartermaster. He rejected much of the finished hardware furnished by defendant in error. At that time a considerable part of the hardware had been furnished. Capt. Godwin testifies that perhaps 25 per cent. of it had been put in place. This action of the constructing quartermaster was taken on or about August 9, 1923. The finishing hardware included butts for cabinets, transoms, sash doors, and the like, transom lifts, bolts, hinges, coat and hat hooks, door stops, control operators for windows, etc. It is unnecessary, for the purposes of this discussion, to itemize it in detail. In his letter of August 9, 1923, Constructing Quartermaster Godwin said:

"Your attention is called to the fact that, although a complete schedule of hardware for this project is required by the specifications before the work is put in place, there has not been to date furnished this office complete hardware schedule, so that the hardware can be properly checked. Please comply immediately with paragraph 368 of the specifications, which require that this shall be done. No approvals of hardware will be considered final by this office, although samples have beeen submitted from time to time in the past, until this schedule has been received, properly checked and returned to you, as set forth in the above-mentioned paragraph."

The schedule provided by section 368 of the specifications was first furnished by defendant in error on August 11, 1923. This schedule was objected to by the quartermaster, because the items were referred to by a reference number, but there was no clue as to what catalogue or to what concern's hardware that reference number referred; therefore he found it impossible to determine what the article was. He asked to be furnished with the necessary catalogues and data, but was informed that such could not be furnished. Samples were offered in their place. Concerning this Constructing Quartermaster Godwin testifies as follows:

"There was a reason why I wanted a schedule, instead of the sample, before me. In the first place, the schedule was required. In the second place, the schedule and the samples are two entirely different phases of the matter. The description in the schedule should have been on hand prior to reading the samples submission, in my opinion. The schedule is supposed to show both quantity and quality. No schedule other than 'Exhibit 12' (the one to which reference has been made) was furnished, to my knowledge. None was ever furnished to me. I could not make a satisfactory check of the work without the schedule, because it was impossible for me to tell what they proposed to furnish. As a matter of practice, when these schedules are submitted to the Quartermaster General, we have a definite approval in advance of the work that is then contemplated, and that would be binding upon the constructing quartermaster."

The grounds upon which many of the rejections were made are thus stated by the constructing quartermaster:

"I rejected the 1,378 butts for cabinets, transoms, sash doors, and so forth. The first ones submitted were rejected by me. I final-

ly required defendant to replace those butts. The ground of my position was that the butts submitted were an inferior article; that the specifications did not state what grade that butt was to be, and as the contract requires where such specifications were not stated, that they shall be the best of their kind, that butt, in my opinion, was not the best of its kind. The plating on it was extremely poor. In a communication to defendant I stated that the butts were, in a good many instances, then rusting in places. I took up this matter of butts with the Quartermaster General's office before I gave my final decision. The matter was submitted to him. He upheld my decision. I required the defendant to furnish other butts in place of those rejected. I think a few of these butts that I disapproved were in place; roughly, 20 or 25 per cent."

"The iron brass-plated transom lifts were rejected as not in accordance with the specifications, and brass transom lifts were required by me under the ruling of the Quartermaster General. The basis of my decision was that it was exposed hardware and as such was required to be brass."

"The specifications in reference to the bolts in question required a ⅝-inch bolt—that is, it was to be ⅝-inch square in a section. I was notified by defendant that they could procure no such bolt."

"The coat and hat hooks were rejected as bein a poor quality of plating."

"The base door stops were rejected because the articles delivered did not comply with the samples, due to the fact that they were much lighter in sections."

"The chain control operators for buildings 5 and 14 were not of proper metal. They should have been brass, but were brass plated iron. Secondly, the windows in those buildings were of a much heavier type than a transom. This operator was practically a transom lift, with a chain apparatus applied to it, and was unsuitable, from any point of view, for the operators submitted."

"Item 51, cylinder night latches, 26 were rejected as being cast iron, instead of brass. Just the case that went on the back of the door was cast iron. The cylinder was of brass—all of those cylinders are made of brass, those even on what was furnished. My construction of the specification called for brass night latches. Cast iron japanned was furnished."

The foregoing quotations sufficiently disclose the grounds upon which the rejections generally were made.

Following the action of Constructing Quartermaster Godwin in rejecting certain items of finished hardware on August 9, 1923, defendant in error furnished some of this hardware in compliance with the requirements of the constructing quartermaster. At a later date, to wit, October 13, 1923, it wrote to the Director of the United States Veterans' Bureau, protesting against the rejections that were being made, declaring that, if these were insisted upon, it would suffer a loss of approximately $1,500 on its contract, and requesting a reconsideration of the rulings made. Then followed a great deal of correspondence, including a conference on October 30, 1923, between plaintiff in error, defendant in error, the constructing quartermaster, and the office of the Quartermaster General. Plaintiff in error urged that defendant in error should furnish the hardware required, relying upon an adjustment thereafter in accordance with the terms of the contract. Finally, on December 1, 1923, defendant in error wrote plaintiff in error as follows:

"We propose to treat this contract as being substantially performed by us, and, if there are wanting on the job any small items, we are relieved from furnishing them, or from doing anything further on the contract, by the position you have taken."

The government was firm in its insistence that finished hardware in accordance with the requirements of Constructing Quartermaster Godwin, as confirmed by the Quartermaster General, should be furnished. It, of course, looked to plaintiff in error as the principal contractor. The latter urged upon the constructing quartermaster the acceptance of the hardware furnished, and offered to be furnished, by defendant in error as a compliance with the contract, or, in any event, to allow additional compensation for replacements made and changes urged to be alterations and deviations. Upon final submission to the Quartermaster General, the rulings of the constructing quartermaster, except in some few particulars, were confirmed. Plaintiff in error was confronted by the necessity of furnishing the hardware required or of defaulting in its contract. It elected to furnish this hardware and make the necessary replacements, which it did, as it alleges, at a cost of $6,109.89.

December 19, 1923, defendant in error brought suit against plaintiff in error to recover for the items furnished by it, including those rejected by the constructing quartermaster, in the sum of $8,748.17. Plaintiff in error, by its answer, denied the claim of defendant in error and filed counterclaim for damages because of alleged breach of con-

tract in the sum of $8,053. A jury was waived in writing. After part of the evidence had been taken by the court, reference was made to a commissioner, to take evidence out of the presence of the court, with the understanding that objections might be made and ruled upon when presented later. The trial resulted in a judgment for $8,513.55 in favor of defendant in error.

The theory of the court in arriving at its judgment is disclosed in the following language in its memorandum opinion:

"I hold that, under the contract, plans, and specifications, when Hanssen furnished samples of articles within the language of the specifications, and the same were approved by Warner and the C. Q. M., that, so far as Hanssen is concerned, this constituted a compliance with his contract, provided the articles furnished were in accordance with the approved samples. I go even further; it is my judgment that, when articles were approved by sample and in bulk by C. Q. M. Stirling, and these articles were used by Warner in the construction, that Warner had complied with his contract, and that the government was estopped from afterwards rejecting things so approved and so sued. * * * In view of the foregoing, I hold that, when Hanssen delivered the hardware specified, after submitting samples and having the approval of the C. Q. M., his contract was complied with, and for the goods so furnished, he is entitled to recover."

[1] The established rule is thus stated: "When parties to a contract agree on an umpire or arbitrator, and give him power and authority to make settlement of the amount due from one to the other in performance, and expressly provide in the contract that his determination shall be final and binding upon both parties, neither of them can maintain an action against the other for acts or transactions based on and growing out of the contractual relation, without avoiding the settlement so made for fraudulent conduct on the part of the arbitrator, or for gross mistake, implying bad faith on his part, or for his failure to exercise his honest judgment." United States v. George A. Fuller Co., 14 F. (2d) 813 (C. C. A. 8).

[2, 3] To this may be added that, when the right of final inspection and approval of work already done is reserved, the party in whose favor this reservation is made is not bound by partial settlements and acceptances as the work has progressed, and the arbitrator, at the time of final inspection (the office, and not a special party, having been named in the contract), is the one clothed with au-

thority to make the final decision. The conclusiveness of the decision may not be implied.

[4] It is not necessary that any set form of words be used to express the purpose. It is sufficient if the intent be clear and unambiguous. This is the general rule, supported by the overwhelming weight of authority. Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; Sweeney v. United States, 109 U. S. 618, 3 S. Ct. 344, 27 L. Ed. 1053; Martinsburg & Potomac R. R. Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; Sheffield, etc., R. Co. v. Gordon, 151 U. S. 285, 292, 14 S. Ct. 343, 38 L. Ed. 164; United States v. Gleason, 175 U. S. 588, 602, 20 S. Ct. 228, 44 L. Ed. 284; Mercantile Trust Co. v. Hensey, 205 U. S. 298, 309, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572; Elliott v. Missouri, K. & T. Ry. Co. (C. C. A. 8) 74 F. 707; Guild v. Andrews (C. C. A. 8) 137 F. 369; Choctaw & M. R. Co. v. Newton (C. C. A. 8) 140 F. 225, 233; United States v. Hurley (C. C. A. 8) 182 F. 776; Frisco Lumber Co. v. Hodge (C. C. A. 8) 218 F. 778, 780; Road Improvement District v. Roach et al. (C. C. A. 8) 18 F.(2d) 755, decided March 24, 1927; 10 Ann. Cas. 575, containing an exhaustive review of state decisions.

In Guild v. Andrews, supra, Judge (now Mr. Justice) Van Devanter, said: "Good faith, which is presumed in the absence of clear and convincing evidence to the contrary, renders the action of the arbiter final and conclusive."

In Choctaw & M. R. Co. v. Newton, supra, this court used the following language: "The language of some of the courts, of highest authority, is that the proof of fraud must satisfy the mind of the court beyond a reasonable doubt. It is not sufficient that it should arise from a mere erroneous or unjust judgment or opinion of the umpire; nor can the award be disturbed upon the mere weight of evidence, in the conflicting opinions of expert witnesses, or based on the notion of a master resulting from a technical analysis of the evidence. * * * A mere mistake by the arbiter, not admitted by him, is insufficient to vacate the award."

[5] The contract between the government and plaintiff in error reserved this power throughout the performance of the work in the constructing quartermaster and the Quartermaster General of the United States. The contract between defendant in error and plaintiff in error contained the same express reservation, and furthermore was made subject to all stipulations and agreements contained in the contract between the govern-

ment and plaintiff in error. There can be no doubt, therefore, that Constructing Quartermaster Godwin was acting within the scope of his authority, unless that action violated the terms of the contract, or involved fraudulent conduct on his part, or gross mistake, implying bad faith, or failure to exercise his honest judgment. We think it clear from the record that the rulings of the constructing quartermaster were tainted neither by fraud nor by failure to exercise an honest judgment. The conflict in testimony as to the quality of the material furnished and tendered by defendant in error we may not resolve. This determination was left to the constructing quartermaster and his superior, the Quartermaster General. They were made the interpreters of the true intent and meaning of the drawings and specifications. We are remitted, therefore, to the insistence of counsel for defendant in error, both below and in this court, and as indulged by the trial court, as the only ground upon which this judgment can be sustained. This is, in effect, that when defendant in error delivered the hardware, after submitting samples, and having the approval of the constructing quartermaster then in charge, his contract was complied with, and for the goods so furnished he is entitled to recover.

Respecting this approval, upon which reliance is placed, this is to be said: The submission of samples under paragraph 367 of the specifications involves also the furnishing of the schedule provided by paragraph 368. It is clearly contemplated that the samples shall be viewed in the light of the kind of material to be furnished, as shown by this schedule; that schedule must be approved, not only by the constructing quartermaster, but ultimately by the Quartermaster General himself. Constructing Quartermaster Stirling, in his letter of February 14, 1923, makes a qualified approval of the samples then before him. He said: "Finished hardware like samples submitted will be used where specified." He then invites specific attention to paragraph 368—the schedule paragraph—and demands that that paragraph should be complied with as soon as possible. Full compliance with that paragraph was never made under the ruling of the constructing quartermaster, and no schedule at all was filed until after the rejection of much of the material tendered.

However, the contract between the government and plaintiff in error, to which the contract of defendant in error is made subject, expressly provides that no preliminary test or acceptance shall preclude the United States from rejecting work upon final inspection or test at completion; that tests may be made at any time during the performance of the contract, and that no acceptance shall deprive the United States of any claim against the contractor by reason of latently defective articles, materials, or workmanship; and of the existence of such defects, or of noncompliance with the contract, the constructing quartermaster and the Quartermaster General are made the final judges.

Counsel for defendant in error point to the provision of paragraph 8 of the contract under the heading "General Conditions," that: "When required by the C. Q. M. the contractor will furnish him in advance with samples of the material he proposes to use on the buildings, and samples so furnished must, after having been approved, be adhered to."

It is evident that this language applies to situations other than those provided for under more specific headings. Defendant in error furnished his samples under section 367; not at the special request of the constructing quartermaster, but in conformity with this section governing the performance of his subcontract. It is quite evident that this general provision, the application of which might or might not be found necessary, was not intended to, and did not, limit the reservation in the contract that no preliminary test or acceptance shall preclude the United States from rejecting work upon final inspection or test at completion.

[6, 7] It is also insisted that much of the material demanded by Constructing Quartermaster Godwin was not kept on hand, and therefore was not "stock," as defined in paragraph 364 of the specifications. It will be noted, however, that this same paragraph says that "the description of items contained in the specifications shall be considered as standard." The constructing quartermaster defines a "stock article" as one that is standard on the market; with any particular firm it is stock of that firm, and does not necessarily have to be at all times in quantities on the shelves. At any rate, the specifications provided that the articles specified should be the best of their kind, and defendant in error must be held to have contracted with knowledge of the right of the constructing quartermaster to insist upon this provision.

But, in any event, the contract with plaintiff in error, to avoid the delays that must operate disastrously both to the contractor and to the public improvement contemplated, provided that "any claims, doubts, or disputes upon matters of fact concerning or arising out of this contract, or as to its performance

or nonperformance, shall be referred to the Quartermaster General for determination"; that upon these matters of fact his decision should be binding and conclusive, but not upon any question of legal rights or liability. It was further provided that "no suit, action, or claim shall be sustainable in any court of law or equity against either party hereto until after the reference and decision above provided for." The contract of defendant in error was made subject to all such stipulations and agreements. It declined to make full performance and to allow its claim to take the course contemplated by the governing contracts.

It must be remembered that much of the material furnished by defendant in error had not been installed; that which was in place was not so permanently inbedded or attached that it could not be removed without appreciable injury. Plaintiff in error carefully stored all of such material that was rejected and removed. In the last analysis, the case below was decided upon the theory that defendant in error had fully performed its contract, and that the constructing quartermaster and the Quartermaster General were without authority to reject material after the approval of samples by Constructing Quartermaster Stirling, as shown in evidence.

In this we think the court erred, and for that reason the judgment below must be reversed, and the case remanded for further proceedings, in accordance with the views herein expressed.