GUY LIGGETT, APPELLEE, V. J. T. BERTWELL, APPELLANT,

FILED MARCH 22, 1924. No. 22692.

Contract construed, evidence examined, and *held*, insufficient to sustain the verdict.

APPEAL from the district court for Douglas county: JAMES M. FITZGERALD, JUDGE. *Reversed and remanded, with directions to dismiss.*

*Kennedy, Holland, DeLacy & McLaughlin,* for appellant.

*Edward R. Burke, contra.*

Heard before MORRISSEY, C. J., DAY, DEAN, ROSE, GOOD and LETTON, JJ., REDICK, District Judge.

REDICK, District Judge.

The petition in this case counts upon an oral contract, whereby it is alleged that the defendant agreed upon a certain contingency to repurchase from the plaintiff 50 shares of stock of the Omaha Refining Company at the par value of $100 a share. The defendant denies the existence of any parol contract, and alleges that the same was in writing. The circumstances out of which the suit arises are substantially as follows: Sometime prior to November 1, 1919, defendant approached plaintiff for the purpose of inducing him to purchase the 50 shares above mentioned, which plaintiff agreed to take und⸱ · considera-

tion. At a subsequent meeting plaintiff suggested that, if he could buy his gasoline from the Omaha Refining Company at wholesale, he would purchase the 50 shares. Defendant replied that the only way in which that could be accomplished would be for the company to put in a filling station on the premises of the plaintiff so as to give him the status of a dealer, and that the company would do that. It finally resulted that the filling station was erected, plaintiff purchased the stock, paying $1,000 cash and a note for the balance which he finally paid and on November 1, 1920, a contract in writing was entered into between the refining company and plaintiff, appointing plaintiff agent for the sale of the company's oils for the period of one year, with the right to either party to cancel the same upon 30 days' notice. This contract was never canceled and the parties operated under it without serious complaint until some time in October, 1920, when some difficulties arose, which will be referred to later in more detail.

Substantially the entire testimony of the complaint upon the subject of the oral contract is contained in the answer to the following question put by his counsel: "Now, I will ask you to state fully what Mr. Bertwell said at that time, and what you said, in reference to the purchase of stock. * * * A. Well, I turned him down on his first call, and decided that I would not invest in it. A short time later he came back, and put the proposition up to me again; and at the same time proposed to sell my firm gasoline. I says, 'Unless you can make us a better price than we are getting I can't afford to change and buy gasoline from a new firm, because I don't know whether they would be able to supply me every time I want it.' He finally made me a proposition that, if I would buy this $5,000 of stock, they would put in a filling station at our plant, and sell me gasoline at the wholesale prices. We were using from 2,000 to 3,000 gallons of gasoline a month; and the wholesale prices would give us a one cent reduction in gas; and a graduated reduction of from $5 a month up, owing to the volume of gasoline used, would make us a saving of any-

where from a cent and a half to two cents a gallon. Well, I figured it would save us at least $40 a month the year around, which would make about $480 a year. * * * I says, 'If you will give me a proposition in writing, whereby, if for any reason your company ever quits furnishing me gasoline at reduced prices, that you will buy my stock back at par,' and I took a piece of paper, and wrote down just what I wanted. 'Now,' I says, 'If you will sign that personally, I will give you an order for $5,000 of stock.' He took my memorandum and went away, and the next day came back with it typewritten just what I had written, with it typed on the company's stationery, and signed by him personally, agreeing to buy my stock back, if for any reason they quit furnishing us gasoline; and I gave him my note for $5,000 and he sent me the stock."

Defendant testifies that there was nothing said about the quantity of gasoline to be furnished or an uninterrupted supply sufficient for plaintiff's needs (in fact plaintiff does not testify to any such agreement—see his evidence quoted later), and denies that any agreement was made in the language claimed by plaintiff, but gives his version of the conversation as follows: "After the stock was written and delivered, as I remember the matter now, he came to me, and he said, 'I want—I believe it would be better for me to have that in writing.' I said, 'All right, I will put it in writing, the way I understand it.' I gave him the letter that has been read to you five days after the stock was delivered, or written, dated and delivered." The letter referred to, and which defendant claims was the only contract between the parties, is as follows:

"November 5, 1919.

"Mr. Guy Liggett, 1515 Jones street, City.

"Dear Mr. Liggett:

"I hereby agree to buy the stock of Omaha Refining Company owned by you, amounting to fifty shares at par $100.00 per share, if for any reason the company cancels the contract whereby you now get dealers' rate on oils

used by the Pantorium and sold through your filling sta-
tion at 1515 Jones street.

"Yours very truly,

"J. T. BERTWELL."

In view of our conclusion, we do not deem it necessary
to determine this dispute between the parties as to which
was the contract, for in our judgement the determinative
question in the case is whether or not the verdict of the
jury is sustained by sufficient evidence, and for that pur-
pose we must assume the contract to have been in the
terms stated by the plaintiff. The appeal is by defend-
ant from a verdict and judgment for plaintiff in the sum
of $5,000.

The solution of the problem before us will be found in
the answer to the question: What is the proper interpre-
tation of the phrase. "If for any reason your company ever
quits furnishing me gasoline at reduced prices?" Of course,
the intention of the parties is to be determined by giving
to the language its usual meaning in connection with the
subject and the circumstances surrounding the parties.
For this purpose it is not consonant with the best reason-
ing to hold the parties to a strict definition of the terms
made use of by them as given by the lexicographers; but,
unless the context or circumstances indicate the use of the
terms in a special sense, such definitions are valuable aids.
Webster defines the word "quit," so far as it has any ap-
plication to our present inquiry, as follows: "To set free
as from anything harmful, to relieve or release; to clear;
to liberate. * * * To release from obligation, accusa-
tion, penalty, or the like; to absolve, acquit. To discharge,
as, an obligation or duty; to meet and satisfy. * * *
To have done with; to cease from; to stop; hence, to de-
part from; forsake; as, to *quit* work; to *quit* the place;
* * * to let go; yield; surrender." And he gives the
following synonyms: "Leave, relinquish, resign, abandon,
forsake, surrender, discharge, requite." And Soule gives
in addition, "desert, forswear, cast-off." It will be noted
that each of these definitions and synonyms, as applied to

the act of a person, involves the idea of an intention of the party charged with the act to accomplish the result following it. To quit doing anything implies an operation of the mind whereby the decision is reached to abandon a course of procedure which had been theretofore followed. The term in its common and ordinary acceptation involves the idea of finality, an ending of the state of, a complete departure from a former course of conduct, and would be entirely inappropriate as characterizing a mere failure or delay in the performance of an act. True, such failure or delay might be so long continued as to give rise to an inference of an intention upon the part of the person chargeable therewith to abandon the future performance of the act or contract in question, but this merely proves the correctness of the proposition that the intention of the actor is essentially involved in the term "quit." That the plaintiff considered the term to have some such meaning as we have adopted is indicated by the expression in his letter quoted in full later on: "We feel that it is your intention to discontinue business with us."

We are therefore of the opinion that before the plaintiff is entitled to recover, or even to have his case sent 'o the jury, he must produce some evidence from which an inference may be properly drawn that the refining company quit furnishing him gasoline, intending to abandon their former conduct in that behalf, and that a mere failure on their part to furnish it promptly, while it would give rise to an action of damages if plaintiff were compelled to purchase the gasoline elsewhere at a greater price, would not be such a breach of defendant's contract as would support this action.

It is therefore necessary to review the evidence in as favorable a light to the plaintiff as permissible, and we find the following facts are without substantial dispute: The contract between the plaintiff and the refining company covered a period of one year from November 1, 1919, to November 1, 1920. Gasoline was furnished substantially in accordance with its terms until October 1, 1920,

shortly after which date there were some delays on the part of the company, but the following deliveries were made in October 2d, 221 gallons; 8th, 30 gallons; 11th, 227 gallons; 15th, 291 gallons; 23d, 300 gallons. Evidence for plaintiff is to the effect that on four occasions he ordered gasoline which was not delivered at the time wanted and he was compelled to purchase it elsewhere. The exact dates of these occurrences are not shown. Evidence for defendant is to the effect that on two occasions the latter part of October they sent their trucks to the plaintiff's place of business to deliver gasoline in response to orders, and in the first instance it was refused on the ground that plaintiff had purchased elsewhere, and on the second, though the tanks were only half full, gasoline was refused on the ground that orders had been given elsewhere, which evidence was not denied other than by the statement of plaintiff's employees that they had no recollection of the occurrence, but admitting its probability. There was never any refusal upon the part of the company to furnish gasoline, but in every instance the order was accepted and delivery promised. Plaintiff gave no orders for gasoline after October 26, 1920. On that day he wrote the following letter:

"Omaha, Nebr., Oct. 26, 1920.

"Mr. J. T. Bertwell, c|o Omaha Refining Co., East Omaha, Neb.

"Dear Sir:

"For the past month, it has been almost impossible for our firm to get sufficient gasoline from your company to keep us going. This morning we are entirely out, and upon calling your firm, were informed that you could not deliver us any gas today.

"In view of the fact that you have not been furnishing us sufficient gasoline in the past, and that prospects look no better for the future, we feel that it is your intention to discontinue doing business with us. I therefore take this opportunity to call your attention to the letter you gave me November 5th, 1919, at the time we entered into

a contract with you to use your gasoline and for the purchase of 50 shares of your stock. At that time you gave me a letter stating that if for any reason the company should cancel our contract or discontinue furnishing us gasoline, that you would buy my stock back at par.

"I expect you to live up to that contract, and the stock is here ready for you the minute you bring in a $5,000 check. I will be only too glad to make the exchange, Tom, because I feel the Omaha Refining Company has a rocky road before it. Very truly yours,

"The Pantorium, by GUY LIGGETT, President."

"Omaha, Neb., November 1, 1920.

"Mr. Guy Liggett, 1513 Jones St., City.

"Dear Friend Guy:

"Your letter of October 26th received. We might be out of gasoline occasionally and thereby cause you to buy a load or two from some other firm but we think we are capable of keeping a fairly good supply on hand with which to fill your orders when they come in. We shall hope to take care of you right along as we have in the past and we have your name on our special list. Yours very truly,

"Omaha Refining Co., J. T. BERTWELL, Vice-Pres."

There was some evidence that during the month of October the refining company had some difficulty in getting a supply of gasoline to fill its contracts, in consequence of which there was some delay in deliveries. The company went out of business March 25, 1921, and was declared a bankrupt April 12, 1921, but we do not consider these facts material to our present inquiry, which is simply whether or not on October 26, 1920, the refining company had quit delivering gasoline within the meaning of the contract between plaintiff and defendant, so as to authorize him to declare a breach thereof. This action was brought February 5, 1921.

We are clearly of the opinion that the meaning and intent of the parties, as evinced by the language used and the circumstances surrounding them, was that the defendant would repurchase the stock if the refining company

refused to furnish plaintiff gasoline at wholesale or dealers rates. The evidence fails to disclose any such refusal which cannot be erected upon the refusal of the plaintiff to receive the gasoline when brought, or to continue ordering the same after the 26th of October. Without expressing any opinion upon the rights and liabilities of the parties to this contract consequent upon the bankruptcy of the refining company, we hold that there is no evidence of a breach of the contract by defendant prior to the bringing of this suit sufficient to sustain the verdict rendered.

Judgment reversed and cause remanded, with directions to dismiss.

REVERSED AND DISMISSED.