## TOBIN QUARRIES, Inc., v. CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DIST.

### Civil Action No. 57.

District Court, Nebraska, Hastings Division.

Jan. 8, 1946.

W. C. Fraser (of Crofoot, Fraser, Connolly & Stryker) all of Omaha, Neb., and John M. Martin and Frank L. Martin, both of Los Angeles, Cal., for plaintiff.

R. O. Canaday and Paul E. Boslaugh (of Stiner, Boslaugh & Stiner) all of Hastings, Neb. for defendant.

202

DELEHANT, District Judge.

On October 26, 1945, for reasons set forth in an unpublished memorandum, the court declined to enter a summary judgment upon the motion of the plaintiff. That memorandum sufficiently recognizes the jurisdiction of the court resting on diversity of citizenship and the existence of a situation warranting the employment of the statutory procedure for a declaratory judgment. 28 U.S.C.A. § 400. The record then appeared to contain certain issues not wholly legal, which the court was unwilling abruptly to foreclose by a summary judgment. Promptly thereafter the parties stipulated in writing for the final submission of the case upon its merits on the basis of "the pleadings, exhibits and affidavits submitted in support of and in opposition to the plaintiff's motion for summary judgment and upon the argument and briefs of the parties submitted to the court on said motion." Further trial or hearing was waived by both parties.

The defendant is a public corporation erected by act of the Nebraska legislature. One of its properties is the Kingsley Dam, a large multiple purpose structure in the Western part of Nebraska. In 1944 it publicly invited competitive bidding upon certain contract work consisting of the "completion of the construction of the riprap on the upstream slope of the Kingsley Dam and abutments, the north bank of the stilling basin and on road dikes approaching the south abutment." One of the designated principal items of work in the venture was: "Furnishing and Placing Gravel or Rock Spall Filter Layer—243,500 tons." It is with respect to that item that the present controversy has arisen. The defendant prepared and published detailed plans and specifications for the entire work, upon which the plaintiff, a Missouri corporation engaged in business as a building contractor, made the prevailing bid, resulting in a formal contract dated September 22, 1944.

Section 2.4 of the detailed specifications incorporated into the contract, is in the following language:

"Filter Layer—After the dam surface has been prepared as described above, the filter layer shall be placed. Placement of the filter layer shall follow the preparation of the dam surface within four days after the removal of the concrete riprap, except as approved in writing by the Engineer as heretofore set forth under 'Removal, Break-up and Replacement of Existing Concrete Riprap'. The material for this layer shall be gravel, small quarry stone or a mixture of gravel and stone, or a mixture of gravel or stone with broken concrete blocks not exceeding 4″ in greatest dimension.

"Gravel shall be clean, hard, durable pieces graded from ¼ inch to 2½ inches, of a quality equal to that generally specified for first class, Portland Cement Concrete. Not more than five per cent shall pass through a No. 4 screen.

"Quarry stone shall be equal in quality to that specified below in Paragraph 2.5. As loaded in cars for shipment, not more than 5 per cent shall pass through a No. 4 screen. All stone for the filter layer shall pass between grill bars spaced four inches apart. All slab pieces of stone shall be removed.

"The filter layer shall be 15 inches in minimum thickness over the surface of the dam measured normal to the surface slope of the dam, according to grades established by the Engineer. The Contractor shall protect the filter layer throughout construction operations so that the completed riprap will rest on a filter layer of uniform thickness not less than that specified."

Touching it, the plaintiff, besides quoting the specification of gravel, alleges in the complaint that it "gives to the plaintiff the option to construct the filter layer at its option, of (1) gravel, (2) small quarry stone, (3) a mixture of gravel and stone, or (4) a mixture of gravel or stone with broken concrete blocks not exceeding four inches in their greatest dimension." The court understands the defendant to admit both the exactly quoted and the generally averred provisions of Section 2.4. (See Paragraph V of complaint and Paragraph II of answer.)

From the showings made in support of the motion for summary judgment and now before the court, it satisfactorily appears that the plaintiff, entering upon the performance of the contract, elected to furnish gravel for the filter layer, or the major portion thereof, and proceeded, and proposes to continue, to furnish gravel, of which engineers for the defendant in a series of sixteen tests by samples found that the following several percentages by way of an average throughout the tests

were retained on the following respective sized screens:

| Retained on | 2½″ | 2″ | 1½″ | 1″ | ¾″ | ½″ | No 4. Screen |
|---|---|---|---|---|---|---|---|
| | 3% | 5.2% | 10.2% | 23.6% | 34.9% | 55.8% | 96.7% |

Thus 3.3% of the gravel furnished passed through a No. 4 screen.[1]

The defendant, through its engineer, after the work had been partially done declined to allow the plaintiff to continue to furnish the gravel thus tendered and notified the plaintiff in writing that the only filter layer prepared from gravel which would be accepted by the engineer and the defendant must comply with a gradation, in consequence of which the following several percentages would be retained on the following respective sized screens:[2]

Compliance with the defendant's demands for specific intermediate gradations of gravel would very substantially increase the cost to the plaintiff of its work in comparison with the cost involved in its furnishing of gravel as originally furnished and still tendered by it.

Contending that its gravel already furnished and tendered not only meets, but actually surpasses, the requirements of the specifications, and that, if the defendant now desires a specific intermediate gradation between the identified maximum and minimum size requirements it must issue a change order as contemplated in section

| Retained on | 2½″ | 2″ | 1½″ | 1″ | ¾″ | ½″ | No. 4 Screen |
|---|---|---|---|---|---|---|---|
| | 0%–5% | 5%–40% | 20%–60% | 35%–72% | 44%–80% | 54%–86% | 95%–100% |

[1] The results of the sixteenth separate tests entering into the computed average result are as follows:

| "2½″ | 2″ | 1½″ | 1″ | ¾″ | ½″ | #4 | % Passing |
|---|---|---|---|---|---|---|---|
| 3.8 | 4.5 | 8.3 | 23.8 | 36.6 | 53.9 | 95.3 | 4.7 |
| .4 | 2.4 | 5.9 | 18.4 | 30.3 | 48.6 | 96.3 | 3.7 |
| .1 | 2.3 | 5.1 | 16.2 | 27.0 | 44.5 | 96.1 | 3.9 |
| 2.3 | 4.7 | 7.8 | 17.8 | 30.3 | 50.2 | 98.4 | 1.6 |
| 1.7 | 3.1 | 6.7 | 16.3 | 24.6 | 47.4 | 94.5 | 5.5 |
| 3.7 | 6.8 | 10.9 | 21.2 | 32.2 | 49.5 | 96.9 | 3.1 |
| 4.7 | 8.6 | 13.5 | 28.1 | 39.7 | 55.0 | 97.2 | 2.7 |
| 4.3 | 7.3 | 13.7 | 27.5 | 40.2 | 57.1 | 96.9 | 3.1 |
| 7.2 | 10.1 | 17.7 | 33.5 | 43.4 | 61.9 | 96.8 | 3.2 |
| 1.4 | 2.2 | 5.2 | 14.5 | 25.2 | 53.1 | 97.2 | 2.8 |
| 3.9 | 6.3 | 12.2 | 25.5 | 35.2 | 58.1 | 97.4 | 2.6 |
| 4.3 | 6.9 | 13.8 | 27.1 | 37.0 | 60.7 | 96.6 | 3.4 |
| 4.1 | 4.4 | 8.8 | 28.6 | 45.2 | 70.5 | 97.5 | 2.5 |
| 1.6 | 2.4 | 5.0 | 16.0 | 26.9 | 53.5 | 95.2 | 4.8 |
| 2.0 | 4.5 | 10.2 | 22.5 | 32.4 | 56.8 | 96.7 | 3.3 |
| 2.1 | 6.6 | 18.8 | 40.9 | 52.2 | 71.3 | 97.9 | 2.1 |

| | 2½″ | 2″ | 1½″ | 1″ | ¾″ | ½″ | #4 | % Passing |
|---|---|---|---|---|---|---|---|---|
| Average— | 3.0 | 5.2 | 10.2 | 23.6 | 34.9 | 55.8 | 96.7 | 3.3 |
| Lowest— | .1 | 2.2 | 5.0 | 16.0 | 24.6 | 44.5 | 94.5 | |
| Highest— | 7.2 | 10.1 | 18.8 | 40.9 | 52.2 | 71.3 | 98.4 | " |

It will thus be seen that on one occasion, in the fifth recorded test, the contractual tolerance of five per cent in the matter of passage through a No. 4 screen was exceeded to the extent of one-half of one per cent. The parties present no question upon this obviously trivial departure, the average passage being three and three tenths per cent.

[2] While no substantial issue or discussion touching filter layer prepared from rock appears in the pleadings or briefs (which have to do with gravel) demand by the engineer is also pleaded in the complaint that such rock material meet the following retention prescriptions:

| Retained on | 4″ | 3″ | 2½″ | 2″ | 1½″ | 1″ | ¾″ |
|---|---|---|---|---|---|---|---|
| | 0%–5% | 5%–25% | 9%–37% | 15%–50% | 22%–60% | 35%–72% | 42%–88% |

| ½″ | No. 4 Screen |
|---|---|
| 54%–86% | 90%–100% |

1.31 of the specifications [3] and pay the increased cost thus resulting, the plaintiff instituted this action, and in its complaint prayed for a declaratory decree, finding and decreeing that gravel of the sizes and percentages furnished and tendered by it meets its obligations under the contract; that if the defendant is unwilling to accept such gravel, the defendant is obliged by the contract forthwith to issue a change order as provided in the cited section 1.31, and for general relief and costs.

The defendant, answering, maintains the propriety of its engineer's directions, and prays for a declaratory decree to the effect "that the defendant is entitled to a filter layer constructed of pieces of gravel between the sizes of $1/4$ to $2\frac{1}{2}$ inches that have been graded and is acceptable to the engineer; * * * that the grading of the gravel pieces involves a question of fact and that any dispute with reference thereto must be referred to the engineer for settlement and that his decision thereon shall be final"; and for general relief and costs.

The contract was executed, and is to be performed, in Nebraska. The parties to it are a Nebraska corporation and a Missouri corporation which, in its performance, operates under a license to do business in Nebraska. It is, therefore, a Nebraska instrument; and the law to be administered in this controversy arising out of it is that of Nebraska, Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, which is to be sought after the fashion suggested in Yoder v. Nu-Enamel Corporation, 8 Cir., 117 F.2d 488, 489, 490.

In support of its reliance upon the declared position of its engineer, the defendant relies principally upon two features of the contract, its general prescriptions touching his authority in the matter of inspection and approval and its more specific provision for the reference to him of certain designated disputes.

The general clauses dealing with the supervisory and inspectional authority of the engineer, which the defendant cites,[4] are:

"Article II

"The Contractor agrees to furnish and deliver all tools, equipment, apparatus, facilities, transportation (except freight on

---

[3] The cited section follows:
" 'Change Orders'—If, in the construction, it becomes necessary to change or add to the work covered by this contract in order to complete the same, and the material or labor involved in such change is not included in the unit prices of the contract, but forms an inseparable part of the work to be done under this contract, and the delay involved in asking for and advertising for bids and the letting of a new contract therefor might result in damage, injury, or impairment of the plant, work, system or other property belonging to the Owner, the Owner may, in its discretion, declare an emergency and require the Contractor to proceed with such alterations and additions. The Contractor shall not, however, be required to perform such extra work and furnish such extra materials without a written order from the Engineer. The parties hereto may agree upon a lump sum to be paid for said work in advance of performing the same. In event no agreement as to payment shall have been arrived at prior to the performing of said work or furnishing said materials, the Contractor shall keep an accurate, detailed record of all of his costs for labor, material, compensation insurance, and supplies, furnished by him. He shall be entitled to repayment of all such costs enumerated above, and

in addition thereto a reasonable allowance for the use of his plant and equipment, and in addition thereto, fifteen per cent of the net cost of labor and material used in said additional work, which fifteen per cent shall include his profit, his general superintendent, and other general expenses. It is expressly understood that the fifteen per cent provision above set forth shall be computed only on the actual cost of labor and material that go into this extra work exclusive of insurance. No payment will be made for such extra work until a 'Change Order' has been signed by the Contractor and approved by the Owner."

[4] Due and careful attention has been given to several other similar references in the contract, some of which are cited and quoted in the defendant's brief, and others are now set out on the court's own motion to the end that they may all be noted. They include the following:

(a) In the Instructions to Bidders, under the caption, Interpretation of Documents, appears the following language: "Should a bidder find discrepancies in or omissions from the specifications, or should he be in doubt as to their meaning, he shall, at once notify the chief engineer and general manager of the owner and if the point in question is not clearly and fully set forth, a written addendum or bulletin of

filter material and rock for riprap) and services, labor and material, and do all work necessary to construct and complete according to the Plans and Specifications, which are entitled 'Kingsley (Keystone) Dam—Group 28D-2' and are identified by the signatures thereon of the parties to this Agreement, the work described in Group 28D-2 of his Proposal for which he was the successful Bidder. *It is understood and agreed that said tools, equipment, apparatus, facilities, transportation, and services, labor and material shall be furnished, said work performed and completed as required in the Plans and Specifications under the direction and supervision of and subject to the approval of the Owner or its representatives."* (Emphasis added)

"From Article III

"The Engineer will, promptly after the completion of the work, make a thorough inspection and if he finds that the work has been performed and completed in accord-

---

instructions will be mailed or delivered to each person obtaining a set of contract documents as provided for in the 'Notice to Bidders.' Each person requesting an interpretation will be responsible for the delivery of his request to the chief engineer and general manager. The owner will not be bound by, nor responsible for, any other explanations or interpretations of the proposed documents than those given in writing as set forth in this paragraph. Oral instructions, interpretations or representations shall not be binding upon the owner."

The quoted language contemplates procedure prior to the making of a bid and then only in the case of discrepancies in or omissions from the specifications, or of doubt by a prospective bidder respecting their meaning. No issue arises upon discrepancies and omissions. And by the submission of the case upon the contract itself without evidence, lay or scientific, as to its meaning, the ground for doubt respecting its meaning is negatived. Besides, both parties insist that its meaning is perfectly clear, each, however, after the manner of its own contention. And no obscurity in its meaning is apparent to the court.

(b) The second paragraph of Article I of the contract follows: "In the event of a discrepancy or apparent discrepancy between any of the Contract Documents, as above defined, at the request of the Contractor, the Chief Engineer of the owner (hereinafter referred to in the Contract Documents as 'engineer') shall give a written interpretation thereof, which interpretation shall govern."

It may sufficiently be repeated at this point that no issue involving discrepancy, either real or apparent, in the documents is involved in the case.

(c) Section 1.3 of the specifications is as follows: "In case of discrepancy in the Contract Documents (as defined in the Agreement) figured dimensions shall govern over scaled dimensions; special provisions shall govern over both Specifications and Plans. In the event of a discrepancy, or an apparent discrepancy between Plans and any other Contract Documents, it is understood that the Contractor shall request, and the Engineer give, an interpretation in writing of the intent of the contract."

But, again, no discrepancy between the plans and other documents is involved.

(d) Section 1.7 of the specifications provides: "Inspectors shall be authorized by the Engineer to inspect all work done and all material furnished. The Inspector shall not be authorized to revoke, alter or waive any requirement of the Specifications. He shall be authorized to call the attention of the Contractor to any failure of the work or materials to conform to the Specifications and contract. He shall have authority to reject materials or suspend the work until any questions at issue can be referred to the Engineer."

The quoted language refers only to the rights of inspectors as distinguished from the engineer, and is manifestly limited to checking work done and materials furnished, not to the construction of the contract.

(e) The concluding sentence of Section 1.8 of the specifications is: "No work shall be done nor materials used without suitable supervision and inspection by the engineer or his representative."

That language can add nothing to the inspectional rights of the engineer quoted in the body of this memorandum.

(f) Section 1.9 of the specifications provides in part that: "The source of supply of each of the materials shall be approved by the Engineer before delivery is started. Only materials conforming to the requirements of these Specifications and approved by the engineer shall be used in the work."

No issue arises upon this language which has to do with the quality of materials tendered or used by the contractor to fulfill his obligations under the contract, as distinguished from a construction of the contract to determine those obligations.

ance with the terms of this contract, he shall so certify in writing to the Owner. If the Engineer finds said work should not be accepted, he shall so state, and shall give his reasons therefor to the Owner and the Contractor.

"The final payment shall become due and payable upon the filing of the Final Estimate properly filled out and executed and the Engineer's Certificate accepting the work and will be promptly paid thereafter."

Section 2.8 of the Specifications:

"Payment for filter layer of gravel and/or stone on cars at shipping point and payment for unloading and placing same in the work shall be at the unit price bid per ton of 2,000 pounds for natural-dry gravel or stone placed in the completed filter layer.

"The number of tons furnished shall be determined by the railroad weights contained in the original copy of the paid freight bills, but payment will be made only for filter layer placed and accepted by the Engineer."

The clause dealing with the reference of certain disputes follows:

"Article IV

"All questions of fact, and any and all disputes with reference thereto, arising out of the performance of this contract, or changes therein, or extra work in connection therewith, shall be submitted to the Engineer for his decision and his decision, made in writing and filed with the Owner and the Contractor, shall be final and binding on the parties hereto."

Those provisions, coupled with the obvious conclusion that the contract requires, not the separate furnishing of certain material and the performance of specified labor thereon, but rather the production of a completed project, are said by the defendant to confer on the Engineer's position in the instant controversy the attribute of finality, and to bar the maintenance of the plaintiff's contention respecting the extent of its obligations under the contract.

That such authority may lawfully be vested in an engineer-referee seems to the court to be settled. Attention will be given later to the plaintiff's argument to the contrary. It is clearly to be understood, however, that an agreement for reference of disputes, either generally or in limited scope, is not to be imported into a contract by judicial fiat, but must be made between the parties and preserved in the contract. Upon this point there is no disagreement between the parties to the suit, nor any diversity of opinion in the reported cases bearing upon the issue. So, for the present, it will be sufficient to declare that the court's primary inquiry is whether the language of the contract is adequate to grant the authority.

While the rule is recognized that, in the event of ambiguity, the language of a contract is generally to be construed adversely to him who has prepared it, Wilson v. Cooper, C.C.D.Neb., 95 F. 625; Drainage Dist. No. 1 v. Rude, 8 Cir., 21 F.2d 257; Gulf Refining Co. v. Home Indemnity Co., 8 Cir., 78 F.2d 842; People's State Bank v. Smith, 120 Neb. 29, 231 N.W. 141; Lyman-Richey Sand & Gravel Co. v. State, 123 Neb. 674, 243 N.W. 891, 83 A.L.R. 1301; Ericson v. Nebraska-Iowa Farm Investment Co., 134 Neb. 391, 278 N.W. 841, it is not necessary to resort to that canon of construction in the present case. The usual meaning of the terms employed in this instance by the parties—a primary objective of judicial inquiry, Liggett v. Bertwell, 111 Neb. 843, 198 N.W. 154; Hompes v. B. F. Goodrich Co., 137 Neb. 84, 288 N.W. 367—is neither obscure nor ambiguous. Resort need not be had, therefore, to a rule whose applicability rests upon dubiety in expression.

The court recognizes and endeavors to follow the other valid rules of contractual construction urged upon it, some of which may be mentioned, but without unnecessary amplification, discussion or citation. It is the duty of the court to interpret and enforce the contract made between the parties themselves; and it may not rightly remake their agreement for them, or create one to suit the judicial idea of how they should have agreed. Generally—and no excepting circumstance is suggested here—the construction is to be made from the language of the contract itself, with a conscious effort to give effect to every part—even to every word—of the instrument, and without disproportionate emphasis upon one or more, to the neglect of others, of its provisions. The objective of the court's construction should be to ascertain, if possible, and if legally permissible to enforce, the intention of the parties.

The underlined language of Article II (supra) of the contract is inadequate to vest the engineer with the author-

ity which the defendant claims for him. It is true that the plaintiff is thereby required to furnish materials, etc., and to perform and complete work "under the direction and supervision of and subject to the approval of the owner or its representatives", and that the engineer is its representative. But the materials and work involved are to be furnished, performed and completed only "as required in the Plans and Specifications." Surely, the right of "direction, supervision and approval" vested in the engineer does not imply a right in him to exact from the plaintiff materials or labor beyond the plain prescriptions of the contract, including its specifications. The same considerations apply to Section 2.8 of the specifications (supra).

■ Upon like reasoning, the quoted portions of Article III do not sustain the defendant's position. They deal with the engineer's functions in the matter of final inspection, and certification either of acceptance or of rejection, and the necessity of the engineer's acceptance of the work as a condition to final payment.

In passing, it may be noted that this is not the occasion for final inspection and acceptance or rejection. Despite his current threat finally to reject the work if 'it be performed in harmony with the plaintiff's pleaded tender, he may think differently when he is confronted with the responsibility of final examination and decision.

■ But, more significantly, his inspection is explicitly oriented by the quoted language itself, to "the terms of this contract"; and if the work be completed "in accordance with" those terms the plaintiff is entitled to its acceptance. Limiting itself to the language of this particular contract, the court unhesitatingly holds that it does not confer with conclusive finality upon the engineer an arbitrary power of acceptance or rejection. His action must be governed by the obligations of the plaintiff under the contract itself. And if, through collusion, conspiracy or fraud, or by his obstinate persistence in demands beyond the fair intendment of the contract, he arbitrarily rejects the work, his rejection is not conclusive upon the defendant. Mercer v. Harris, 4 Neb. 77; School District v. Randall, 5 Neb. 408; Anderson v. Imhoff, 34 Neb. 335, 51 N.W. 854; Prime v. Squier, 105 Neb. 766, 181 N.W. 923; Melson v. Turner, 125 Neb. 603, 251 N.W. 172; Howard County v. Pesha, 103 Neb.

296, 305, 310, 172 N.W. 55. In the case last cited, the Supreme Court of Nebraska, dealing with a contract conferring sweeping powers on an architect (103 Neb. at page 305, 172 N.W. at page 58), declared by way of quotation from approved authorities (103 Neb. at page 310, 172 N.W. at page 60): "The arbitrary or unreasonable refusal to issue a certificate of performance will, however, constitute such fraud as to render the production of such certificate unnecessary, though made a prerequisite to recovery by the contract"; and again: "Where payment of the builder is dependent upon a certificate, decision, or estimate of the architect or engineer, it is the duty of the latter to give the certificate, upon being satisfied that the builder is entitled thereto, and (he) must exercise his power of withholding a certificate with reasonable discretion and not capriciously, and is only justified in refusing where there is a real and substantial failure on the part of the builder to fulfill his duty under the contract."

In the manifestly and admittedly harsh prevailing opinion in Thompson-Starrett Co. v. La Belle Iron Works, 2 Cir., 17 F. 2d 536, 537, an "actual cost plus six per cent" construction contract was involved which contained a clause that "the work included in this contract is to be done under the direction and to the satisfaction of the general superintendent of mines." And, over a vigorous dissent, it was held that such satisfaction was a prerequisite to recovery by the contractor, even though the work actually and strictly conformed to the specifications. It is not considered that the majority opinion is in harmony with the thought underlying the opinions of Nebraska's Supreme Court upon the question. And this court will not follow it in determining this Nebraska case.

■ General powers in an architect or engineer of supervision, inspection, and acceptance or rejection are, therefore, limited by the proper definition, under the contract and its basic plans and specifications, of the builder's undertaking and duty. The concession to his ruling in many reported opinions of the attribute of absolute finality either presupposes his exaction of no work beyond the requirements of the contract, or rests upon some contractual bestowal upon him of the power of final construction of, and decision upon, the requirements of the contract or of plans and specifications, or of both, or of the final

arbitrament of all disputes, without limitation to those arising out of questions of fact.

So, the consideration of Article IV (supra), dealing with the reference of certain disputes, is required.

 At this point it is in order, preliminarily to declare that the court does not agree with counsel for the plaintiff in their extreme view that it was not competent for the parties to the contract so to have written it that the defendant's engineer would have had the power, subject to the foregoing considerations of arbitrariness, obstinacy, bad faith, etc., to make with finality a demand of the character he has made. One may grant their major premise that the parties to a contract may not, by covenant, oust the judiciary of its general jurisdiction to enforce their resulting contractual liabilities. And authority may be found for the thought that, within this premise, a stipulation in a construction contract requiring the reference of disputes thereunder to an engineer or architect, with the power of final and binding decision, is valid only in respect of questions of fact, and invalid to the extent that it attempts to vest such officer with the authority to determine the extent of the obligations of the parties under the agreement. But the law seems quite definitely settled otherwise, both in Nebraska, in the eighth judicial circuit, and generally in the United States. Appeal of Roadmix Construction Corporation (Roadmix Construction Corporation v. State), 143 Neb. 425, 9 N.W.2d 741; Peterson v. State, 114 Neb. 612, 209 N.W. 221; Thurman v. City of Omaha, 64 Neb. 490, 90 N.W. 253[5]; Warner Construction Company v. Louis Hanssen's Sons, 8 Cir., 20 F.2d 483; Kennedy v. City of White Bear Lake, 8 Cir., 39 F.2d 608; McCullough v. Clinch-Mitchell Construction Co., 8 Cir., 71 F.2d 17, and cases therein cited which will not be specifically identified here; State Highway Department v. MacDougald Construction Company, 189 Ga. 490, 6 S.E. 2d 570, 137 A.L.R. 520, and the many authorities there collated and analyzed; United States v. John McShain, Inc., 308 U.S. 512, 520, 60 S.Ct. 134, 84 L.Ed. 437.

In the face of those cases, and almost innumerable others to like effect, Mitchell v. Dougherty, 3 Cir., 90 F. 639, and Davis v. United States, 82 Ct. Cl. 334, may not be accepted as sufficient to carry the burden of the plaintiff's argument upon the point. The eighth circuit court in McCullough v. Clinch-Mitchell Construction Co., supra, reached its conclusion, notwithstanding the citation of Mitchell v. Dougherty, supra, upon the primary question of the invalidity of agreements ousting the courts of their general jurisdiction. The sweeping language in Davis v. United States, supra, limiting valid contractual references to disputes of fact was purely gratuitous dictum, for the reference clause of the contract there involved extended only to questions of fact. Besides, Davis v. United States, supra, was later relied upon by the Court of Claims in support of its decision in John McShain, Inc., v. United States, 88 Ct. Cl. 284; and that case, on appeal, was directly reversed by the Supreme Court of the United States in United States v. John McShain, Inc., 308 U.S. 512, 520, 60 S.Ct. 134, 84 L.Ed. 437, which reaffirmed its earlier rulings in Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342, and Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 36 S.Ct. 662, 60 L.Ed. 1058. Upon this point generally, and touching the McShain case particularly, see English Construction Co. v. United States, D.C.Del., 43 F.Supp. 313; Silas Mason Co., Inc., v. United States, 90 Ct. Cl. 266; Dravo Corporation v. United States, 93 Ct. Cl. 270; Globe Indemnity Co. v. United States, 102 Ct. Cl. 21, 38; A. Guthrie & Co., Inc., et al. v. United States, 102 Ct. Cl. 472, 496; and United States v. Beuttas, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354. Collins and Farwell v. United States, 34 Ct. Cl. 294, cited and relied upon by the plaintiff, did not in the understanding of this court involve a contract which purported to refer

---

[5] The citation of Thurman v. City of Omaha, supra, is not made inadvertently or in the persuasion that it is directly applicable in this case. On the contrary, it is regarded as authority in Nebraska only for the rule that in some circumstances, and within a limited type of contracts, stipulation may be made for the satisfaction of a referee or even a party as a final test of performance. For the further application of the case, see: Flower v. Coe, 111 Neb. 296, 196 N.W. 139. For its limitation, see: Prime v. Squier, 105 Neb. 766, 181 N. W. 923; Melson v. Turner, 125 Neb. 603, 251 N.W. 172; and Board v. Spitzer, D.C.Ohio, 255 F. 136.

all disputes to or confer a power of interpretation upon the engineer. But if that understanding be mistaken, then its persuasiveness is impaired by United States v. John McShain, Inc., supra.

On the other hand, the defendant asks the court liberally to appraise the dispute clause of the instant contract (Article IV, supra) in its favor according to the favorable language of many palpably distinguishable cases. Its authorities have been carefully examined by the court. Imperative brevity forbids their adequate analysis here, but the inapplicability of most of them requires at least mere mention.

In the Nebraska case of Appeal of Roadmix Construction Corporation, supra [143 Neb. 425, 9 N.W.2d 746], the contract provided that "The Engineer shall decide *any and all questions which may arise* as to the quality or acceptability of materials furnished and work performed * * * and * * * *all* questions which may arise as to the interpretation of the plans and specifications, and all questions as to the acceptable fulfillment of the contract on the part of the Contractor." In Kennedy v. City of White Bear Lake, 8 Cir., supra [39 F.2d 610], the decision rested ultimately upon a provision of the contract that the engineers "are to decide *all questions as to compliance or non-compliance with the specifications* of the contract"; and also upon the engineer's decision on a specific matter that was unquestionably one of fact. In McCullough v. Clinch-Mitchell Construction Co., 8 Cir., supra [71 F.2d 19], the contract, "to prevent all disputes and misunderstandings in relation to any stipulations contained in this agreement, or in reference to any of the specifications and plans * * * or their performance by either of * * * parties," provided that "the Chief Engineer shall be, and he is hereby made, an umpire to decide *all matters arising out of or growing out of this agreement.*" In Warner Construction Co. v. Louis Hanssen's Sons, 8 Cir., supra [20 F.2d 485], the contract made the constructing quartermaster *the final interpreter of "the true intent and meaning of the drawings and specifications"* and otherwise expressly committed to him the determination of the very questions at issue. In Ripley v. United States, 223 U.S. 695, 750, 32 S.Ct. 352, 56 L.Ed. 614, the engineer's decision was held final upon matters of detail that in the contract were explicitly committed to his exclusive deter-

mination. In Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106, the particular element of distance in the carriage of materials was expressly entrusted to the determination of the district chief quartermaster. In Choctaw & M. R. Co. v. Newton, 8 Cir., 140 F. 225, 227, the chief engineer was made the umpire finally to decide all disputes or misunderstandings between the parties, "in relation *to any of the stipulations and provisions contained* in this agreement, or *the true intent and meaning thereof and of the specifications hereunto annexed, and of the plans, profiles, and drawings relating thereto, or the matter of the performance of said contract by either of said parties.*" United States v. Gleason, 175 U.S. 588, 20 S.Ct. 228, 229, 44 L.Ed. 284, involved the issue of delay in performance which, by the contract, was expressly referred to "the judgment of the engineer in charge." United States v. Mason & Hanger Co., 260 U.S. 323, 43 S.Ct. 128, 67 L.Ed. 286, concerned the right of a contractor to reimbursement for premium on a contract performance bond whose payment had been approved by the contracting officer, the contract expressly providing reimbursement for expenditures for *"such bonds,* fire, liability, and other insurance *as the contracting officer may approve or require.*" In Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 140, 57 L.Ed. 342, the contract provided that "if there was *any discrepancy* between plans and specifications, or between the contract of McLaughlin and the contract of Plumley, the matter should be referred to the Secretary [of the Navy]" with finality in his decision; and, in large part, the case concerned such discrepancies. Chicago, Santa Fe & California Railroad Co. v. Price, 138 U.S. 185, 11 S.Ct. 290, 34 L.Ed. 917, involved a contract which provided that the chief engineer's *measurements and calculations of the quantities and amounts of the several kinds of work should be conclusive upon the parties;* and sustained such measurements and calculations in the controversy over them. In Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 36 S.Ct. 662, 663, 60 L.Ed. 1058, the contract provided that "the decision of the supervising architect *as to the proper interpretation of the drawings and specifications* [shall] be final." The provisions of the contract involved in Martinsburg & Potomac Railroad Co. v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255,

are essentially and verbally indistinguishable from those involved in Chicago, Santa Fe & California Railroad Co. v. Price, supra, which was decided chiefly upon the authority of the Martinsburg & Potomac Railroad Co. case. The contract involved in Anderson v. United States, 9 Cir., 123 F.2d 13, 15, provided that the "decision of the contracting officer or his authorized representative *as to the proper interpretation of the drawings and specifications* shall be final "; and in the case, the element of dispute involving the extent of the contractor's duty under the contract was decided upon the basis of that clause. English Construction Co. v. United States, supra, also involved a contract giving to the authorized representative final interpretative determination respecting *the drawings and specifications,* and, in addition, required the submission to him for final decision of *"all other"* (thus eliminating only labor disputes referable to the Board of Labor review) *"disputes concerning questions arising under this contract."* [43 F.Supp. 314.] The exhaustive opinion of the Supreme Court of Georgia in State Highway Department v. MacDougald Construction Co., 189 Ga. 490, 6 S.E.2d 570, 572, 137 A.L.R. 520, upon which the defendant rests a substantial measure of its argument involved a contract vesting the State Highway Engineer with the most comprehensive authority. Thus, it provided that: "The decision of the State Highway Engineer *upon any question connected with the execution of this agreement* * * * shall be final and conclusive." And the Georgia court very properly held that the quoted inclusive language resulted in the vesting of the engineer with the power to construe the contract for the purpose of determining the kind of material required by its terms. (Emphasis in all instances added.)

But Article IV (supra, pages 5 and 6) is distinguishably narrower than any of the dispute reference clauses noted in the preceding paragraph or in other cited cases not herein analyzed. It contains no language clothing the engineer with the power to construe and determine, between the parties to the contract, either its meaning generally, or the significance of its plans and specifications, or the extent of the contractor's liability under the documents. Nor does it require the reference to him of *all* disputes or controversies, or of "any dispute or controversy" arising under the contract. What are to be referred to him, by the terms of the contract, are *"all questions of fact,* and any and all disputes with reference thereto, arising out of the performance of this contract, or changes therein, or extra work in connection therewith." Thus, the phrase, "questions of fact," governs and limits the entire reference section.

Accordingly, it is necessary to determine whether the dispute underlying this suit is with reference to a question of fact. And the court is compelled to answer that inquiry negatively, and to hold that the issue between the litigating parties concerns a question of law, not one of fact. It involves the construction of the contract itself, whose terms are neither conflicting nor obscure, for the purpose of measuring the extent of the contractor's obligation under it.

It is quite true that the interpretation of a contract may in some circumstances involve a question of fact, as for example, where it contains contradictory or confusing provisions, or technical terms requiring expert interpretation, particularly if that interpretation be controversial, or where the parties themselves have controllingly construed it in its practical performance, or otherwise. In re Estate of Enyart, 100 Neb. 337, 160 N.W. 120; Myers v. Persson, 94 Neb. 467, 143 N.W. 447; State v. Commercial Casualty Ins. Co., 125 Neb. 43, 248 N.W. 807, 88 A.L.R. 790. But no such factor is discernible here, and the parties, in the manner of their final submission of the case (vide supra), have negatived such an issue. Where the terms of the contract are admitted and are not in conflict and are unaided by parol evidence, their interpretation presents not a question of fact, but one of law. Kimball v. Cooper, 134 Neb. 536, 279 N.W. 194; Crancer v. Reichenbach, 130 Neb. 645, 266 N.W. 57; Martin v. Reavis, 117 Neb. 219, 220 N.W. 238; Peru Plow & Implement Co. v. Johnson Bros., 86 Neb. 428, 125 N.W. 595; Hinman v. F. C. Austin Manufacturing Company, 65 Neb. 187, 90 N.W. 934; Western Manufacturing Co. v. Rogers, 54 Neb. 456, 74 N.W. 849; Drainage District No. 1 v. Rude, 8 Cir., 21 F.2d 257; Battista v. Horton, Myers & Raymond, 76 U.S.App.D.C. 1, 128 F.2d 29; John A. Frye Shoe Co. v. Williams, 312 Mass. 656, 46 N.E.2d 1; Atwood v. City of Boston, 310 Mass. 70, 37 N.E.2d 131; Hayes v. Board of Trustees, 224 N.C. 11, 29 S.E.2d 137; Horvath v. Sheridan-

Wyoming Coal Co., 58 Wyo. 211, 131 P.2d 315; People v. Marsicano, 57 Cal.App.2d 591, 135 P.2d 16; Universal Sales Corp. v. California Press Mfg. Co., Cal.Sup., 118 P.2d 291; Richards v. Pacific Southwest Discount Corp. 44 Cal.App.2d 551, 112 P.2d 698; Solace v. T. J. Moss Tie Co., Mo. App., 142 S.W.2d 1079; Brown v. Neyland, Tex.Civ.App., 161 S.W.2d 833; Ex parte Deaton, 243 Ala. 154, 8 So.2d 819; Ruby v. United Sugar Companies, 56 Ariz. 535, 109 P.2d 845. And that rule has consistently been followed in the construction of contractual clauses identical with, or indistinguishable from, Article IV of the present contract. General Steel Products Corp. v. United States, D.C.N.Y., 36 F. Supp. 498; Lundstrom v. United States, D.C.Or. 53 F.Supp. 709; Davis v. United States, supra; Rust Engineering Co. v. United States, 86 Ct. Cl. 461; Plato v. United States, 86 Ct. Cl. 665; Callahan Construction Co. v. United States, 91 Ct. Cl. 538. And see discussion in United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49, though there the issue was clearly one of fact.

■ The court is satisfied, after a comprehensive study of the authorities bearing upon the point, that the question involved in the present case is solely the determination of the measure of the plaintiff's obligation under an undisputed written contract,[6] and that such determination is a question of law, and is not a question of fact. It follows, therefore, that the dispute clause does not require its reference to the engineer, and that the court must pass upon it, uninfluenced by the engineer's declared attitude.

■ Considering Section 2.4 of the specifications (supra), the court concludes that the plaintiff's view of it is correct. So far as issue is made here, it requires only that the gravel furnished "shall be * * * pieces graded from ¼ inch to 2½ inches, * * *. Not more than five per cent shall pass through a No. 4 screen." No prescription as to the quality of the gravel is challenged in the case. So, to strip the section to its critical elements, such prescriptions have been deleted in the latest quotation.

The admitted and unchallenged tests in behalf of the defendant establish that the tendered gravel is of sizes between ¼ inch and 2½ inches with a tolerance of only 3.3% passage through a No. 4 screen. And, without finding that the actual gravel tendered meets, in all respects, the contract's specifications of gravel for filter layer, and limiting its determination to the single element of the size of the gravel pieces, the court does find and hold that the contract requires only that the plaintiff furnish gravel, in no specific intermediate gradations, but in varying sizes, none smaller than ¼ inch and none larger than 2½ inches, with not more than 5% of its content passing through a No. 4 screen. That conclusion is obvious and inevitable unless the contract commits to the engineer the power to require intermediate gradation in sizes and percentages suitable and acceptable to him. And in the discussion which has already ensued, such a construction of the contract has been rejected.

Certain other arguments offered by the parties should have brief mention and comment.

■ The defendant urges that the conclusion which the court reaches neglects, and gives no significance to the word, "graded." The court can not agree. Quite the contrary, it considers that its interpretation meets every definition of the word both from engineering texts and lexicographers and from legal authority which the diligence of counsel has supplied. Essentially and in this context it signifies, "arranged in order according to size." 38 C.J.S., Grade, p. 972. And that quality may clearly be predicated of gravel of the characteristics, as to tested sizes, which the plaintiff admittedly has tendered. It is not questioned that, after excavation from the pits, the plaintiff has actually processed the gravel furnished and tendered by it in such fashion as to eliminate pieces larger than the prescribed maximum and smaller than the minimum, and to meet the requirement of maximum passage through a No. 4 screen. Both briefs expressly concede it and the supporting affidavits indicate it. Unless there shall be read into the specifications, after the word, "graded," the phrase, "in such intermediate sizes as the engineer shall prescribe" within the designated limits, or its equivalent in significance, there can be no question of the plaintiff's

_____

6 As the defendant states at one point in its brief, "*the argument between the parties is over what the defendant is entitled to* and not over any contention that if it is demanding more than it is entitled to it should not pay for it." (Emphasis added.)

212

construction. And the court will not presume to make that interpolation.

Nor can the court agree with the thought of the defendant that the plaintiff, in view of the nature and purpose of the project within the contemplation of the contract, has an obligation to meet the defendant's objective in the premises. The defendant has contracted for the construction of a filter layer, to be sure. And the gravel furnished and tendered by the plaintiff will make one. But the contract is for a filter layer from material conforming to certain specifications prepared by the defendant as the basis of the plaintiff's bid. The familiar rule is that in those circumstances, so long as the plaintiff meets the specifications, he is held to no warranty touching their adequacy for the defendant's ultimate purpose. State v. Commercial Casualty Ins. Co., 125 Neb. 43, 248 N.W. 807, 810, 88 A.L.R. 790; MacKnight-Flintic Stone Co. v. Mayor, 160 N.Y. 72, 54 N.E. 661; Reinhardt Const. Co. v. Mayor, 157 Md. 420, 146 A. 577; Pine Bluff Hotel Co. v. Monk & Ritchie, 122 Ark. 308, 183 S.W. 761; Hirsch v. United States, 94 Ct.Cl. 602.

Some language in the plaintiff's original brief may possibly be understood, and has been construed by the defendant, as advancing the thought that the defendant, by making available to the successful bidder certain options on supplies of gravel on designated sites, may be held to have designated and accepted that particular gravel. The court does not understand the argument to proceed to that extremity or to suggest that the defendant must accept pit run gravel from one or more of the optioned pits or from any other source; but if it does, wholly rejects it. The concluding sentence of Section 2.18 of the specifications is, "The owner has made no determination as to the quantity and gradation of gravel available at the optioned location." No further comment upon the point need be made.

The judgment of the court will, therefore, determine that, under the proper construction of the contract and its specifications, the plaintiff is required only to furnish gravel of a quality equal to that generally specified for first class Portland Cement concrete, which shall be clean, hard, durable pieces, graded in sizes not smaller than ¼ inch and not larger than 2½ inches (but without any obligation to provide specific quantities of the several intermediate sizes between said maximum and minimum prescriptions), of which gravel not more than five per cent shall pass through a No. 4 screen; that under the contract the engineer of the defendant has no authority to require the plaintiff to furnish, without adjustment of the payment therefor, gravel conforming to specific intermediate gradations, by him prescribed after the execution of the contract; and that if the defendant persists in requiring specific gradation of gravel pursuant to such prescription of the engineer, the defendant is under the duty and obligation forthwith to issue to the plaintiff a change order signed and approved as provided for in Section 1.31 of the specifications, and to adjust the basis of the plaintiff's compensation and the time for the construction of the filter layer in accordance with the change in the specifications so resulting. The prayer of the defendant's answer will be denied and the defendant will be required to pay the costs of the action.

Care will be taken (vide supra) not to include in the decree any general determination that the gravel actually furnished and tendered by the plaintiff conforms to the contract and specifications. The court determines only what those documents require the defendant to furnish. Once that determination has been made, the further question whether the material actually furnished and tendered satisfies the obligation will be a question, possibly of fact, not presently before the court, and probably determinable under the contract according to a rule different from that applied in this case.

The order will be prepared promptly by the plaintiff's attorneys and submitted to the defendant's attorneys for approval or suggested modification. If approved by the defendant's attorneys, it will then be submitted to the court for entry. If approval or agreement upon it shall be unobtainable, all questions upon it will be submitted to the court at Lincoln, upon notice in writing.

Copies of this memorandum have gone forward by United States mail from the Judge's Chambers to counsel, and the clerk is absolved from responsibility in that behalf.