251 F.2d 324
 Dan H. DAVIES, trading as Davies Reversible Window Products, Appellant,
v.
M. B. KAHN, Irwin Kahn, Saul Kahn, and Bernard Kahn,
partners d/b/a M. B. Kahn Construction Company, Appellees.
 No. 7523.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 26, 1957.
Decided Jan. 6, 1958.
 
 Joseph L. Nettles, Columbia, S.C., for appellant.
 J. Monroe Fulmer, Columbia, S.C. (Fulmer & Barnes, Columbia, S.C., on brief), for appellees.
 Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit judges.
 SOBELOFF, Circuit Judge.
 
 
 1
 Suit was brought by a Chicago subcontractor against the general contractor, a South Carolina construction corporation, which was building the Teaching Hospital for the Medical College of South Carolina, in Charleston.
 
 
 2
 The defendant gave the plaintiff an order on June 13, 1952, for 'reversible sash fixtures,' a type of window designed to allow the sash to be pivoted horizontally so that both sides of the window can be cleaned from the inside. On May 28, 1953, a letter was sent by Kahn, the defendant-general contractor, to Davies, the subcontractor, cancelling the order on the ground that the architect considered Davies' product not equal to that specified; and later, on August 14, 1953, it notified Davies of the cancellation, this time on the asserted ground that the architect had not approved the plaintiff as a subcontractor.
 
 
 3
 The District Judge, before whom the case was tried without a jury, accepted the defendant's contention that the reference in the order to the 'plans and specifications' of the general contract incorporated into the order certain provisions as to approval by the architect. The Judge further concluded that these requirements had not been observed and gave judgment for the defendant. The appeal challenges this action.
 
 
 4
 It becomes necessary to examine the plans and specificatons of the general contract, and to determine what bearing they may have on the order given the subcontractor. We have occasion also to review and consider the legal effect of the conduct of the parties in the interval between the placing of the order and its cancellation.
 
 
 5
 The defendant's purchase order form calls upon the plaintiff to 'furnish the following, according to plans and specifications . . . reversible sash fixtures as per plans and specifications . . . $14,600.00.' The threshold question is the meaning of this language. It is the plaintiff's position that the reference to plans and specifications was merely to determine measurements and quantities, and that the order is an unconditional contract. The defendant, on the other hand, maintains that the plans and specifications, including all their procedural requirements, form a part of the order.
 
 
 6
 In the final cancellation notice, it was the defendant's theory that the order was not a firm contract, but conditional, and that since the subcontractor was not approved by the architect, no obligation whatever rested upon the defendant.
 
 
 7
 * Assuming that the specifications are by reference fully incorporated into and made a part of the order, nowhere do we find in them support for the defendant's claim that the subcontractor needed the architect's approval. Such provisions are not unknown in building contracts, but they cannot be implied as a matter of law. Building contracts and accompanying specifications, like other documents, are to be construed according to their terms. 9 Am.Jur., 'Building and Construction Contracts,' Sec. 7, p. 8; Werbin, Legal Phases of Construction Contracts (1946), p. 222. The agreement of the parties is not to be extended beyond its terms, nor is omitted matter to be supplied, unless necessary to give effective meaning to the language used. We hold, in respect to the specific ground recited in the August letter of cancellation, that there was no requirement that the subcontractor be approved by the architect.
 
 
 8
 The defendant also makes the slightly variant contention that the plaintiff's window sash itself required the architect's approval, and that as no such approval was given, there has been no compliance with a condition of the contract, notwithstanding that the specifications have been strictly adhered to in regard to labor, material, size, quality, etc. We do not read the specifications so broadly. It is true that the specificatons require the architect's approval where equivalents are offered by the contractor in substitution for materials that have been specified by brand name.[1] This window sash, however, was not specified by brand name. The specificatons contain a description of what was to be supplied, and it is not disputed that the plaintiff's sash met the description.
 
 
 9
 That the sash were intended to be ordered by description, and not by brand, appears from the fact that the article is minutely described. Seemingly only as an afterthought is it added that such materials 'may be procured from the Williams Pivot Sash Company, of Cleveland, Ohio.' This impression is strengthened by the fact that elsewhere the specifications say, 'The wood double-hung windows shall be a reversible type of sash similar to the product of the Williams Pivot Sash Company.' This language is not the same as specifying the Williams product, nor does it mean that what the subcontractor tenders must be approved by the architect as the equivalent of the Williams sash. Such approval would be required only if the Williams product 'or approved equal' had been specified. In that case, the substitute would have to be approved. See Murphy v. Salt Lake City, 1925, 65 Utah 295, 236 P. 680. Here the goods of the plaintiff are not offered as a substitute for a specified brand, but as compliance with the detailed description. Cf. Fletcher v. Interstate Chemical Company, 1921, 95 N.J.L. 543, 112 A. 887, 17 A.L.R. 92; Greenbaum v. DeJong, Sup.1917, 166 N.Y.S. 1042. If the article in fact accords with the description, this constitutes performance.
 
 
 10
 If a broader discretion was desired to be given the architest, apt language could have been used to accomplish the purpose. Merely indicating that merchandise of the kind ordered can be obtained from a certain source is not a restriction to that source, nor does it clothe the architect with authority to insist on the merchandise which has been mentioned merely by way of example. In fact, the very specifications before us contain a number of instances in which goods are ordered by brand name[2] and, in respect to such goods, the architect is given the authority to determine whether a proposed substitute is satisfactory. The specifications' different treatment of other items, including the sash, argues against the defendant's interpretation. Note, Tobin Quarries v. Central Nebraska Public P. & I. Dist., D.C.Neb.1946, 64 F.Supp. 200.
 
 II
 
 11
 Should we, however, make the further assumption that the applicable specifications subject the plaintiff's goods to the architect's approval, we find from the course of conduct of the parties in this case that such approval was in fact given.
 
 
 12
 The architect was the firm of Hopkins, Baker, and Gill, of Florence, South Carolina, with Mr. Baker in charge; but as he had had little experience in supervising the construction of hospitals, another firm, Samuel Hannaford and Sons, of Cincinnati, Ohio, was associated as consultant. Mr. Hannaford and his staff participated in the preparation of specifications for the hospital job. It was at the instance of the Hannaford firm that reversible window sash were incorporated in the plans and specifications. Mr. Baker testified that he had had no practical experience with this item and that he could not distinguish between the plaintiff's product and that of the Williams Company. He declared on the witness stand that he was being advised by Mr. Hannaford. He further testified that when specifications mention a product by name, this is simply intended to be a standard, and that when an architect says he has no objection to using another product, he means that he regards it as equal to the named product. This statement is significant in the light of other evidence to be discussed later, that Mr. Hannaford, to whom the plaintiff had been referred by Baker, stated to Davies, and wrote to Baker, that he had no objection to the plaintiff's product.
 
 
 13
 Before the general contract was awarded, the plaintiff contacted the defendant and furnished it with data that was used in preparing its bid. The plaintiff showed his equipment to Mr. Baker in an effort to demonstrate its compliance with the specifications. Mr. Baker, on the witness stand, said that he could see very little difference between the Davies and the Williams sash, and Mr. Davies quoted him as saying that they were 'competitive.'
 
 
 14
 The order from the defendant to the plaintiff followed by a few weeks the award of the general contract. Difficulties did not begin until a month after the order was issued, when the defendant advised the plaintiff that the architect was 'temporarily withholding approval' of the plaintiff. We need not pass upon the plaintiff's contention that Baker's attitude toward him was induced by the Williams Company, the plaintiff's former employer and only competitor, which brought pressure on the architect in its own behalf after the defendant's order was placed with the plaintiff. We merely look now at the events which followed over a period of months. Apart from any technical requirement of the architect's approval of the plaintiff as a subcontractor, or of the plaintiff's product, the plaintiff once again undertook, as a matter of business prudence, to convince Mr. Baker that he complied in every way with the specifications. Again and again he made strenuous effort to meet with Mr. Baker; he wrote him, offering to come to see him in person, but received no reply. Mr. Baker held the plaintiff off. When at last an appointment was arranged, he did not keep it, although the plaintiff had come a long distance to see him, and was kept waiting around for two days. Finally, when reached on the telephone, Baker asked the plaintiff to write him a letter, listing the hospital jobs in which his equipment had been installed. The plaintiff furnished a list of eighteen hospital contracts, each embracing the installation of from two hundred to two thousand windows. Still he did not receive a definite reply from the architect.
 
 
 15
 After a time, he was referred by the architect to his consultant, Mr. Hannaford, who stated to the plaintiff, and wrote to Mr. Baker, that while on the basis of his former experience with Williams, he preferred to deal with that company, he had no objection to using the plaintiff's product. In fact, the plaintiff has furnished reversible windows for a number of hipitals in the construction of which Hannaford was the architect. These windows were accepted as complying with 'Hannaford's specifications,' which were substantially the same as the specifications in this case, embodying a similar reference to the Williams window.
 
 
 16
 The defendant was kept informed of these events as they occurred and was explicitly told by the plaintiff that he regarded himself as a subcontractor. In the meantime, moreover, the defendant dealt with the plaintiff as it did with its other subcontractors. In fact, the general contractor invited the plaintiff to submit a quotation for supplying windows for two additional floors, in the event it should be decided by the State to add to the original plans. Referring to this, the general contractor wrote that the additional cost was to be added to 'your contract.'
 
 
 17
 From time to time for almost a year, the plaintiff received communications from the defendant, calling upon him to supply the necessary certificates of insurance to the State authority; instructing him in regard to payroll and affidavit forms, and compliance with Government wage rate regulations applicable to work being done, as this was, with Government assistance. The plaintiff was furnished shop drawings and advised of the work schedule. These communications the plaintiff consistently acknowledged to the defendant. The plaintiff also received letters from the State authority, declaring that 'We have been advised by the general contractor that you are a subcontractor . . .' and accordingly informing him of the regulations with which he would have to comply. The plaintiff made inquiry of the defendant as to who was doing the weatherstripping so that he could coordinate his work with that subcontractor. This inquiry the defendant acknowledged, replying that when the subcontractor had been chosen, the plaintiff would be advised.
 
 
 18
 Relying upon his subcontract and upon the appearances created by this course of conduct, the plaintiff, with the knowledge and encouragement of the defendant, proceeded, at considerable cost, with the preparation of the material. When the cancellation letter was sent, a year after the order was placed, the plaintiff had completed one hundred and forty sets of windows.
 
 III
 
 19
 We find that the order of June, 1952, was not conditioned upon the architect's approval, but was a firm contract, and that the failure of the architect to approve the plaintiff as subcontractor constitutes no defense to the defendant.
 
 
 20
 As to approval of the product, we hold that unless authorized by the contract, an architect has no inherent power to insist on an article of particular manufacture, not specified in the contract, over one that in all respect responds to the contract. If an architect nevertheless insists upon his 'preference,' when the subcontractor's article is in full compliance with the contract, the contractor is not legally bound by the architect's preference. If the general contractor, in such a case, sees fit, as a matter of business policy, not to oppose the architect's insistence, he is not thereby relieved of his contractual obligation to the subcontractor who supplies precisely what was ordered from him. He may not, to save himself unpleasantness, sacrifice the subcontractor.
 
 
 21
 We are, moreover, of the opinion that if the architect's approval was required for the plaintiff's product, it was given by him and his alter ego, Mr. Hannaford;[3] also, that the course of conduct of the defendant and of the architect to the knowledge of the defendant, is inconsistent with its present claim that there was no unconditional contract between the parties, and consequently the defendant is estopped now from asserting such a claim. See: Stagg v. Connecticut Mut. Lefe Insurance Company, 1870, 10 Wall. 589, 19 L.Ed. 1038; Great Eastern Oil Co. v. DeMert & Dougherty, 1942, 350 Mo. 535, 166 S.W.2d 490; Reck v. Daley, 1943, 72 Ohio App. 307, 48 N.E.2d 879.
 
 
 22
 Accordingly, the judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.
 
 
 23
 Reversed and remanded.
 
 
 
 [1]
 'Materials: When an article of particular brand or make is specified, it is intended to assume that as standard and no other brand or make is to be substituted without consent of the Architects. The term 'ajproved' or 'approved equal' shall mean approved by the Architects and in the event any changes are made in the materials other than those apecified the Cantractor shall make written request to the Architects for their approval.' 'Standards: * * * (c) Reference in these specifications to any article, device, product, material, fixture, form, or type of construction by name, make, or catalogue number shall be interpreted as establishing a standard or quality and shall not be construed as limiting competition and the Contractor, in such cases, may at his option use any article, device, product, material, fixture, form, or type of construction which in the judgment of the Architect expressed in writing is equal to that specified.'
 
 
 [2]
 E.g.:
 'Contractor shall furnish and install a model #550 Incinerator as manufactured by Joseph Goder, Inc., or approved equal.'
 'Mail chutes where indicated on drawings shall be Cutler Mail Chute Equipment, Model 'G' as manufactured and installed complete by the Cutler Mail Chute Co., Rochester, N.Y., or approved equal.'
 'The metal work in connection with bridge over Mills Street shall be Brasco Sash Sections. * * *'
 
 
 [3]
 The term 'Architects' as used in the plans and specifications is broad enough to include the consulting architect, to whom the plaintiff was referred
 'Wherever the word Architects is used it is understood to mean Hopkins, Baker, and Gill of Florence, South Carolina, or their duly authorized representative.'